**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| CAESARS MASSACHUSETTS MANAGEMENT COMPANY, LLC, a Delaware limited liability company, CAESARS MASSACHUSETTS DEVELOPMENT COMPANY, LLC, a Delaware limited liability company, and CAESARS MASSACHUSETTS INVESTMENT COMPANY, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | CIVIL ACTION NO. |
| v. | ) ) | _____ |
| STEPHEN P. CROSBY, *in his personal capacity and in his official capacity as Chairman of the Massachusetts Gaming Commission,* | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

This is an action by Caesars Massachusetts Management Company, LLC, Caesars Massachusetts Development Company, LLC, and Caesars Massachusetts Investment Company, LLC (collectively "Plaintiffs"),  pursuant to 42 U.S.C. § 1983 ("§ 1983"), against Stephen P. Crosby in his official capacity as Chairman of the Massachusetts Gaming Commission (the "Commission"), and in his individual capacity, for violation of Plaintiffs' due process and equal protection rights as guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States of America and enforced pursuant to 42 U.S.C. § 1983.  This is also an action against Stephen P. Crosby individually for tortious interference with Plaintiffs' contractual and

advantageous relationship with Sterling Suffolk Racecourse, LLC and with Plaintiffs'
contractual rights to fair consideration in the Massachusetts gaming license application process.

Plaintiffs have filed this lawsuit challenging the constitutionality, objectivity and fairness
of the treatment of Plaintiffs by Stephen P. Crosby, individually and as Chairman of the
Massachusetts Gaming Commission, due to, among other things, Chairman Crosby's conflicts of
interest and his failure to timely disclose them.  The Commission's staff issued an incorrect and
unprecedented recommendation that Plaintiffs had not met their burden to establish their
suitability, and Chairman Crosby and members of the Commission's staff have made untrue and
misleading statements about Plaintiffs and their affiliates.  Chairman Crosby deprived Plaintiffs
of their due process and equal protection rights and tortiously interfered with Plaintiffs'
relationship with Suffolk Downs and right to fair consideration in the gaming suitability process.
This caused and continues to cause Plaintiffs to suffer reputational and economic injury.

## Venue and Jurisdiction

1.     Plaintiffs Caesars Massachusetts Management Company, LLC, Caesars
Massachusetts Development Company, LLC and Caesars Massachusetts Investment Company,
LLC are Delaware limited liability companies with their principal places of business at One
Caesars Palace Drive, Las Vegas, Nevada.  They were established for the purpose of
participating in an application for the sole gaming license permitted pursuant to M.G.L. c. 23K in
the Greater Boston area, and for the purpose of participating in various aspects of the gaming
operations if the license were granted.

2.     Defendant Stephen P. Crosby ("Crosby") is a Massachusetts resident with his
principal place of business in Boston, Massachusetts.  Crosby is, and has been since 2011,

Chairman of the Commission.  His actions as alleged in the § 1983 counts of this complaint were taken under color of state law.  He is also sued in his individual capacity.

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 2201, and 42 U.S.C. § 1983.

4.     This Court has personal jurisdiction over Defendant Crosby because he resides in Massachusetts.

5.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b), because the events giving rise to these claims occurred here.

**Factual Allegations Applicable to All Counts**

6.     The Commission is an agency of the Commonwealth of Massachusetts established in 2011 by the Massachusetts Expanded Gaming Act (the "Gaming Act").  *See* Ch. 194, Acts of 2011 (Mass.), *codified at* M.G.L. c. 23K.  The declared mission of the Commission is "to create a fair, transparent, and participatory process for implementing the expanded gaming law."  The Commission's place of business is in Boston, Massachusetts.

7.     The Investigations and Enforcement Bureau (the "Bureau") is a law enforcement agency within the Commission, whose tasks include conducting investigations into the suitability of applicants for gaming licenses, and making recommendations thereon to the Commission. M.G.L. c. 23K § 6.

8.     Karen Wells ("Wells") is a Massachusetts resident with her principal place of business in Boston, Massachusetts.  Wells is, and has been since 2013, Director of the Bureau.  In that position, she reports to Defendant Crosby, who determines the functions of her division.  Wells and Defendant Crosby are each the first person to hold his or her respective

position.   On information and belief, Defendant Crosby was the decision-maker, or one of the decision-makers, in the selection of Wells for her position.

9.     Caesars Entertainment Corporation ("Caesars") and certain of its affiliates are operators of casinos and other gaming establishments.  Caesars, by itself and through its affiliates, is licensed to operate gaming facilities in more jurisdictions, both in the United States and abroad, than any other gaming company.  In its 75 years of operation, Caesars has built a reputation for world-class facilities management and regulatory compliance.

10.     The Gaming Act, codified at M.G.L. c. 23K, establishes a process for issuing licenses (denoted "category 1 licenses") for up to three casinos in Massachusetts, one in each of three geographic regions.   The region relevant to this suit, Region A, includes Suffolk, Middlesex, Essex, Norfolk and Worcester Counties.   The Gaming Act licensing process is administered by the Commission.

11.     In 2011, Caesars was asked to invest in, and act as the casino and hotel manager for, Sterling Suffolk Racecourse, LLC ("SSR"), an entity that had already been formed and which intended to apply for a category 1 license in Region A.   The members in SSR include persons and entities related to the Suffolk Downs racecourse located in East Boston and Revere, where SSR originally intended to build and operate a casino, should it be awarded a category 1 license.   Before submitting a full license application, SSR was required by the Gaming Act to undergo an investigation as part of a so-called "suitability determination".   This process includes a determination of suitability, not only as to the named applicant, but also as to various other individuals and entities involved in a casino project.   A suitability finding is a prerequisite to proceeding with submission of a full application.

*The Gaming Act's Licensing Process*

12.     The Gaming Act was passed into law on November 22, 2011.   Pursuant to M.G.L. c. 23K § 3(a), the Gaming Act codifies extensive procedures for the licensing and regulation of gaming by the Commission. The Commission consists of five (5) Commissioners and is headed by a chairman, presently Defendant Crosby.   Under the Gaming Act, the Chairman has "supervision and control over all the affairs of the commission."  *Id.*

13.     The Gaming Act establishes "within" the Commission the Bureau, "which shall be the primary enforcement agent for regulatory matters" under the Gaming Act.  M.G.L. c. 23K § 6(a).  The Bureau is a law enforcement agency, which "perform[s] such functions as the chair [of the Commission] may determine in relation to enforcement, including the investigation of all licensees under this chapter." *Id.*

14.     Wells is the director of the Bureau and exercises and discharges her official duties "subject to the direction, control and supervision of the chair" of the Commission, Defendant Crosby. M.G.L. c. 23K § 6(a).

15.     The Gaming Act requires that "[t]he commissioners and those employees holding major policymaking positions shall be sworn to the faithful performance of their official duties." M.G.L. c. 23K § 3(u).  More specifically, such individuals are required to

> (i) conduct themselves in a manner so as to render decisions that are fair and impartial and in the public interest; (ii) avoid impropriety and the appearance of impropriety in all matters under their jurisdiction; (iii) avoid all prohibited communications; (iv) require staff and personnel subject to their direction and control to observe the same standards of fidelity and diligence; (v) disqualify themselves from proceedings in which their impartiality might reasonably be questioned; and (vi) refrain from financial or business dealings which would tend to reflect adversely on impartiality.

*Id.*

16.     The Gaming Commission has also adopted an Enhanced Code of Ethics which "establishes ethics rules for Commissioners, employees and consultants of the [Gaming

Commission] that are more restrictive than those already applicable to all state employees …." Gaming Commission, Enhanced Code of Ethics, ¶ 1. (Feb. 21, 2013).  The Enhanced Code of Ethics states that "No Commissioner … may participate in a particular matter … pending before the Commission that may affect the financial interest of … a person with whom they have a significant relationship."  *Id.* ¶ 9(A).  "Commissioners must recuse themselves from any licensing decision in which a potential conflict of interest exists."  *Id.* ¶ 9(C).

### Plaintiffs' Role in SSR

17.     Plaintiffs participated in the SSR joint venture in a variety of roles.  Among other things, until Plaintiffs' withdrawal from SSR is completed, one of the Plaintiffs is a member of the main SSR entity, and until the occurrence of the events described herein, Plaintiffs provided funding, development services, and expected to serve as the gaming facilities manager upon completion of the project.

18.     In connection with Plaintiffs' agreements with SSR, Plaintiffs have invested over $100 million dollars in both common and preferred equity.  Tens of millions of that amount has been spent on development costs, including plans, architectural designs and costs in connection with SSR's pursuit of a category 1 license.

19.     On January 15, 2013, SSR submitted its initial application for a category 1 license to the Commission, with Plaintiff Caesars Massachusetts Management Company, LLC identified as the casino operator.

### Chairman Crosby's Undisclosed Conflict of Interest

20.     Plaintiffs were unaware, at the time they submitted materials to the Commission as part of SSR's licensing application and throughout the suitability investigation process, that Defendant Crosby had a publicly undisclosed conflict of interest in contravention of the Gaming

Act's requirements that commissioners must "avoid impropriety and the appearance of impropriety in all matters under their jurisdiction… [and] disqualify themselves from proceedings in which their impartiality might reasonably be questioned,"  M.G.L. c. 23K, § 3(u); and in contravention of the requirement imposed by the Enhanced Code of Ethics that "Commissioners must recuse themselves from any licensing decision in which a potential conflict of interest exists."  This conflict would, on its face, predispose Crosby to favoring a rival application for the category 1 license in Region A.

21.   Specifically, Defendant Crosby failed to disclose publicly his past business and personal relationships with Paul Lohnes ("Lohnes").  Lohnes is a part owner of land located in Everett, Massachusetts that is under option to another group, which is also an applicant for the sole category 1 license in Region A (the "Everett Applicant"), and upon which it would build its casino should it receive the sole Region A gaming license.  Lohnes stands to benefit significantly if that license is granted and the option thereby exercised.  According to press reports, this land was originally purchased in 2009 for $8 million and the option purchase price for this land is $70 million, contingent upon the awarding of a casino license for the site to the Everett Applicant.

22.   Defendant Crosby and Lohnes have known each other since they served in the National Guard together in the 1970s.  They were business partners from 1983 to 1990.

23.   According to another participant in the same business, as reported in the *Boston Globe*, in 1983 that business, which became the Crosby Vandenburgh Group, was struggling financially.  Lohnes invested, became the entity's treasurer, and reportedly saved the entity (and probably Crosby) from a financial downfall.  Within three years of Lohnes' involvement, revenue had grown fourteen-fold, leading to a lucrative sale of the business in 1990.

24.     Defendant Crosby was aware by no later than the fall of 2012 of Lohnes' interest in the land on which the Everett Applicant's casino would  be built if a license were granted to the Everett Applicant, but he did not publicly or otherwise disclose his past business or personal relationship with Lohnes at that time.

25.     On August 22, 2013, Defendant Crosby disclosed his relationship with Lohnes privately to the governor's office, but asserted that he could "perform [his] official duties objectively and fairly."

26.     According to various print and television news reports, in early September 2013, Crosby stepped in to resolve a conflict between the City of Boston and the Everett Applicant, and in doing so cleared a potential obstacle out of the Everett Applicant's way.  The City argued that the Everett Applicant's proposed site in Everett extended into Boston, and thus Boston should be considered a host community under the regulations.  Having Boston as a home community would have required the Everett Applicant to negotiate an agreement with the City regarding finances and impact mitigation as it had with Everett—and as SSR had with both East Boston and Revere.  However, Crosby threatened Commission intervention if the City and the Everett Applicant could not come to an agreement promptly.  On September 6, 2013, Crosby announced that Boston would be a "surrounding community" rather than a "host community".

27.     Because of his personal and business relationships with Lohnes, who stands to gain a significant financial benefit should the Everett Applicant's application be approved and a category 1 license granted to it, Defendant Crosby was and remains conflicted as to consideration of all applications for a category 1 license in Region A.

28.     Defendant Crosby was conflicted during all times that the suitability of SSR, Plaintiffs and the Everett Applicant were investigated by the Bureau.

29.     Wells, as director of the Bureau, reports directly to Defendant Crosby, is subject to his jurisdiction, and, moreover, exercises and discharges her official duties "subject to the direction, control and supervision" of Crosby.  M.G.L. c. 23K § 6(a).

30.     The Commission holds multiple hearings at or over which Defendant Crosby presides, and during which Wells testifies regarding the Bureau's investigations and recommendations.  On information and belief, because of their official positions and the location of their offices, Defendant Crosby and Wells regularly and frequently converse about Commission proceedings outside the context of public hearings and Commission meetings as well.

31.     To fulfill his duties under the Gaming Act and other law and regulation, Defendant Crosby was obliged to inform Wells of all of his actual or apparent conflicts with regard to, *inter alia*,  the Region A licensing process.

32.     As the Commission's chief enforcement officer, and as the official responsible for making suitability recommendations to Defendant Crosby and the Commission, Wells either knew, or Crosby should have advised Wells, of his conflicts.

### *Plaintiffs' Suitability Process*

33.     Pursuant to its governing regulations, the Bureau retained Spectrum Gaming Group LLC ("Spectrum") to conduct an investigation into the suitability of SSR and its qualifiers, including Plaintiffs, under the Gaming Act. Spectrum led the investigation into SSR's suitability in conjunction with the Massachusetts State Police and the Bureau.

34.     In or around April 2013, Spectrum, as customary in the licensing application process, interviewed various employees of Caesars as well as members of Caesars' wholly-independent Compliance Committee, about various matters, including Caesars' compliance

process and background investigation respecting a trademark licensing agreement entered into in the previous month between an affiliate of Caesars and Las Vegas Gansevoort, LLC, a subsidiary of Gansevoort Hotel Group ("Gansevoort").   The Gansevoort trademark licensing agreement granted another affiliate of Caesars the right to use the "Gansevoort" name in connection with hotel and other non-gaming operations of a property in Las Vegas in return for a license fee.   The license fee was based solely on hotel revenue. Gaming revenue was not included. Gansevoort was to have no input in the operation or management of the hotel, other than to advise and specify quality and service levels to be maintained per its brand standards.   Spectrum had questions about one of the principals of Gansevoort, hereafter referred to as the Gansevoort Principal, and published newspaper reports that the Gansevoort Principal allegedly had ties to Russian organized crime.

35.     On May 31, 2013, Timothy R. Donovan, Executive Vice President, General Counsel and Chief Regulatory & Compliance Officer of Caesars ("Donovan"), wrote to Fred Gushin ("Gushin") of Spectrum to explain the due diligence and compliance investigations that had been performed prior to entering the Gansevoort trademark licensing agreement. Wells was copied on this letter.

36.     Caesars' wholly-independent Compliance Committee is comprised of experienced regulatory experts, all of whom are independent of Caesars' management and report directly to Caesars' Board of Directors.   The Compliance Committee thoroughly vetted the facts and circumstances, including those related to the Gansevoort Principal, respecting the Gansevoort trademark licensing agreement.

37.     Donovan informed Spectrum that, *inter alia*, the due diligence investigation by Caesars' Compliance Committee found that there was no evidence supporting media reports and

other publicly-available information purporting to link the Gansevoort Principal to organized crime.

38.     Gushin acknowledged receipt of Donovan's May 31, 2013 letter and advised that he would respond, but he never did so.  Wells and the Bureau likewise did not respond to Donovan's letter.

39.     Following this communication and throughout the summer of 2013, neither Caesars nor Plaintiffs received any further request for information from Spectrum, Wells or anyone else from the Bureau concerning the Gansevoort trademark licensing agreement or the Gansevoort Principal.

40.     On September 24, 2013, Wells asked Donovan, on behalf of the Bureau, to meet with her to discuss several issues.  When Donovan inquired to which issues Wells was referring, she indicated that, although she had not completed her review of the investigative report prepared by Spectrum, she wished to discuss the Gansevoort issue and an issue pertaining to the Chief Executive Officer of Caesars Interactive Entertainment, Inc.

41.     In response, notwithstanding Caesars' own investigation, which did not substantiate the reported links between the Gansevoort Principal and organized crime that were based upon media and other unsubstantiated reports, Donovan suggested to Wells that Caesars was fully prepared to address the Gansevoort issue and would be willing to restructure the relationship with Gansevoort.  Wells stated that such an action would "go a long way" to addressing the Bureau's concerns.  Following this conversation, Caesars immediately notified Gansevoort, thereby initiating the process which could ultimately lead to termination of the Gansevoort trademark licensing agreement if Gansevoort failed to agree to restructure in order to meet the Bureau's concern.

42.    On October 2, 2013 Donovan and other Plaintiffs' representatives attended a meeting with Wells, representatives from Spectrum and other members of Wells' staff in Boston. During that meeting, Wells and the Spectrum representatives expressed their view as to perceived problems with Caesars' due diligence and compliance processes and stated that the Bureau's investigation had now raised concerns in addition to the Gansevoort issue and the issue regarding the Chief Executive Officer of Caesars Interactive Entertainment, Inc., including: (i) Caesars' handling of its relationship with former patron Terrance Watanabe, and (ii) Caesars' present financial stability.  Neither of these latter two issues had been raised previously.  After the formal meeting, Wells told SSR's counsel, for the first time, that it was not the due diligence and compliance process that concerned the Bureau, but rather the decision of Caesars' independent Compliance Committee to allow the trademark licensing  agreement with Gansevoort in light of the media reports and other unsubstantiated reports concerning the Gansevoort Principal's reputed ties to Russian organized crime figures that were revealed and disclosed to the Compliance Committee as part of Caesars' compliance process.

43.    Prior to this time, Caesars and Plaintiffs had understood that the Bureau had never stated that any of its concerns represented a material obstacle to Plaintiffs' participation in SSR's category 1 license application, especially given Caesars' and its affiliates' experiences as operators of casinos in more jurisdictions than any other casino gaming operator in the world.

44.    On October 9, 2013, Donovan met with Spectrum, Wells and other Bureau representatives in the Bureau's offices in Massachusetts.  During that meeting, Wells asserted that, although Caesars had adhered to its own compliance controls in connection with its diligence of its trademark licensing deal with Gansevoort, had conducted a fulsome background check, and with minor exceptions had presented all material information to the Compliance

Committee, the Bureau continued to have concerns over the Gansevoort issue.  Wells maintained that it was the Bureau's position that it was not the adequacy of Caesars' compliance systems or the implementation thereof that concerned the Bureau, but rather the decision of Caesars' independent Compliance Committee to allow an agreement with Gansevoort to proceed that constituted evidence of unsuitability. In addition, for the first time, Wells also claimed that the Gansevoort termination should have been taken immediately after the alleged "notice" provided in April, and that Plaintiffs should have notified their partners.  As described in paragraphs 34 and 35 above, the April 2013 meeting with Spectrum involved interviews and questions in the investigatory process and did not constitute notice of an unsuitability concern.

45.     Continuing its efforts to address the Bureau's alleged and shifting concerns, on October 10, 2013, Caesars called a special Compliance Committee meeting where the new information from the Bureau was presented, including the fact that no cure would be acceptable to the Bureau at this junction.  At the conclusion of the meeting, the Compliance Committee directed Caesars to terminate the Gansevoort trademark licensing agreement immediately.

### *An Impending Finding of Non-Suitability Becomes Apparent*

46.     By mid-October 2013, it became increasingly clear that the Bureau would not issue a recommendation for a finding of suitability respecting Plaintiffs, regardless of any efforts that Caesars and Plaintiffs might take in an attempt to respond to the Bureau's alleged and shifting concerns.

47.     Plaintiffs were advised by their partners at SSR that they had been informed by a representative of the City of Boston that the Commission was going to find Plaintiffs unsuitable. At the same time, the Bureau was informing Plaintiffs that it had made no determination as to its recommendation on suitability.

48.     On October 15, 2013, in a conversation with Caesars CEO Gary Loveman ("Loveman"), Wells refused to provide Loveman with a direct answer as to her impending recommendation regarding Plaintiffs' suitability.  Instead, Wells informed Loveman that, if Plaintiffs' withdrew immediately, she would issue her report without any recommendation regarding suitability; but, if Plaintiffs did not withdraw, she would file her report the following day with a recommendation.  On information and belief, Wells consulted with Defendant Crosby before taking these positions with Caesars.  Loveman reasonably interpreted Wells' position as a statement that the recommendation would not be favorable, and that Caesars and Plaintiffs would be well-served not to allow the recommendation to become a matter of record.

49.     However, Plaintiffs did commence preparation for a suitability hearing that it understood could not occur in less than 30 days.

50.     Later that day, SSR sent an "Unsuitability Notice" to Plaintiffs. An "Unsuitability Notice" is a letter required by the agreement with SSR in the event that a "Licensing Event" occurs.  Under the agreement, a "Licensing Event" occurs when any member of SSR receives any communication from a gaming authority that indicates that a gaming authority may find SSR or any of its members unsuitable for obtaining a gaming license.

51.     The Commission's regulations (205 CMR 101.01 *et seq.*) establish that the Commission will hold adjudicatory hearings to, among other things, hear contests of any factual findings by the Bureau relative to suitability, and make phase 1 suitability determinations.  The process for reviewing suitability recommendations by the Bureau laid out in the regulations gives an aggrieved applicant 30 days to request a hearing.

52.     The Commission's regulations provide that the Commission, after receiving the recommendation of the Bureau, "shall initiate a process for a public hearing or adjudicatory

proceeding." 205 CMR 115.04(1). Subsection (2) provides the applicant a 30-day window to give a notice of claim requesting a hearing. That 30-day period runs from the date that an applicant, here SSR, is given notice of the Bureau's recommendations.

53. Additionally, the Massachusetts Administrative Procedures Act requires that a party "shall have sufficient notice of the issues involved to afford them reasonable opportunity to prepare and present evidence and argument." M.G.L. c. 30A, § 11(1).

54. Despite the pressure being placed on Caesars and Plaintiffs by Wells, Donovan informed SSR's legal counsel on October 15, 2013 that Plaintiffs intended to go forward with the adjudicatory hearing on its suitability and to request an adjudicatory hearing after 30 days to dispute the anticipated finding of unsuitability.

55. Wells, willfully ignoring the requirements of the law and regulations, stated that the Bureau expected the suitability hearing to occur within the 30-day window and thus prior to the host community referenda for SSR's project scheduled to be on the November 5, 2013 ballot in East Boston and Revere.

56. To justify this foreshortened period that would leave Plaintiffs unable to prepare fully for a suitability hearing, Wells stated that the Commission needed to have the hearing before the vote to avoid the impression that the Commission was hiding anything from the voters. However, the Everett referendum respecting the Everett Applicant's project occurred in June of 2013, and the suitability hearing is to occur in December of 2013. Similarly, a referendum regarding a proposal by another applicant in Springfield (the "Springfield Applicant") took place in July of 2013, whereas the Commission held a suitability hearing on December 9, 2013. Indeed, Plaintiffs are unaware of any other applicant that was required to have a suitability hearing prior to a referendum. The Commission's regulations provide that the host community

election may occur prior to a positive determination of suitability if the community's governing body approves of holding the election and voting households are informed about the standards and procedures for suitability determinations and that, notwithstanding the outcome of the election, no license will be issued without a finding of suitability.  Those steps had been taken with regard to the SSR proposal in which Plaintiffs were participating.

57.     On October 16, 2013, before the Bureau's recommendation had been issued, counsel to SSR advised Plaintiffs that counsel had communicated with Wells and Catherine Blue, the Commission's General Counsel.  Blue and Wells stated that an adjudicatory proceeding on the suitability determination would occur before the end of October 2013, and that there was nothing Caesars, Plaintiffs or SSR could do to stop it.  Blue and Wells  maintained that, despite the "30 days" notice language, the Commission could schedule a hearing at any time on its own initiative.

58.     In the same communication, Counsel for SSR advised Plaintiffs that Wells said that she intended to send the Bureau's letter and report to the Commission the following day, October 17, 2013.  She reiterated her earlier statement that, if Plaintiffs withdrew immediately, she would refrain from making any suitability recommendation.  On information and belief, Wells consulted with Defendant Crosby before taking these positions.

59.     Wells and Blue informed SSR's counsel that they would be scheduling the hearing within 24 hours of finalizing the letter, to occur before the end of October 2013.  Plaintiffs were advised that Wells and Blue told SSR's counsel that if Plaintiffs withdrew immediately, they could do so as a matter of right, but that a later withdrawal would require approval by the Commission.

60.     Finally, Plaintiffs were advised that Wells and Blue said that they would schedule a pre-hearing conference for the following week, the week of October 21, 2013.

### The Bureau's Recommendation Letter

61.     Plaintiffs declined to withdraw immediately as Wells suggested; and, on the evening of October 18, 2013, Plaintiffs received the Bureau's recommendations to the Commission.  These recommendations included that each of Plaintiffs "has **not** met its burden by clear and convincing evidence to establish its suitability" (emphasis in original), and that the Commission find SSR suitable if Plaintiffs were not part of the project. On information and belief, Wells consulted with Defendant Crosby before making these recommendations to the Commission.

62.     Because the Gaming Act places the burden on the applicant to demonstrate suitability, the statement that Plaintiffs had failed to establish suitability is effectively a recommended finding of non-suitability, rather than a neutral point.  *See* M.G.L. c. 23K § 12; 205 C.M.R. 115.01(2) ("Burden of Proof. All applicants for a Phase 1 suitability determination must establish their qualifications by clear and convincing evidence.").

63.     On information and belief, based on a review of all publicly available information, no other suitability recommendation issued by the Bureau has utilized this language.  *See* July 2, 2012 Ourway Realty, LLC Recommendation Letter ("The [Bureau] recommends that the Commission find the applicant, Ourway Realty, LLC, suitable for licensing subject to the following condition..."); July 3, 2013 PPE Casino Resorts, MA LLC Recommendation Letter ("The [Bureau] recommends that the Commission find the applicant, PPE Casino Resorts, MA LLC, suitable for licensing."); July 3, 2013 Raynham Park, LLC Recommendation Letter ("The

[Bureau] recommends that the Commission find the applicant, Raynham Park, LLC, suitable for licensing subject to the following conditions...").

64.     Most tellingly, the Bureau has even issued a recommendation for a category 1 applicant, despite finding that applicant's application materially incomplete.   The Bureau nevertheless refrained from making a final recommendation as to that applicant's meeting of its burden to prove suitability.   This is despite the fact that the applicant failed to identify (and thus establish the suitability of) its planned majority owner and financial source, and failed to demonstrate the suitability of its principal organizer.   Rather, the Bureau's letter merely declined to make any recommendation at all regarding that applicant's suitability to the Commission.

65.     Similarly, the Bureau's recent recommendation for another applicant (referred to herein as the "Springfield Applicant") employed a different standard altogether: "[T]he [Bureau] advises the Commission that . . . it has not discovered any disqualifying factors that would necessarily preclude the Applicant from being issued a Category 1 Gaming License."   The letter goes on to make a conditional recommendation, stating, "[t]he [Bureau] recommends that the Commission find the applicant . . . suitable for licensing subject to the following conditions...", and further suggests a series of conditions to the license based, apparently, on concerns raised and not addressed during its investigation of that applicant.

66.     Conspicuously absent from the Bureau's recommendation letter (though discussed in its investigative report) is any mention of a former fifty-percent gaming partner of  the Asian affiliate of the Springfield Applicant in Macau (the "Macau Partner").   An investigation by the New Jersey Division of Gaming Enforcement ("NJDGE") of the New Jersey Casino Control Commission (the "New Jersey Commission") resulted in   a report suggesting that the fifty-percent partner was not independent of a family member whom the applicant acknowledged was

unsuitable.  In fact, in 2009, in connection with the Springfield Applicant's application for a license renewal in New Jersey, the NJDGE issued a Special Report concluding that the Springfield Applicant's association with the Macau Partner compromised the Springfield Applicant's suitability for a gaming license in New Jersey, based on serious concerns that the Macau Partner was being controlled and influenced by the family member.  Prior to a final determination by the New Jersey Commission, the Springfield Applicant entered into an agreement with the NJDGE to place its interest in the New Jersey casino into a trust for subsequent disposition and withdrew its pending application for a renewal of its New Jersey gaming license until such issues could be addressed.  The Massachusetts Bureau's Investigative Report regarding the Springfield Applicant discusses this incident.  Yet, the issue did not make it into the Bureau's recommendation letter to the Commission, and did not prevent the Bureau from recommending that the Commission find the Springfield Applicant suitable subject to certain conditions.

67.    There is no reasonable, non-discriminatory reason for the difference in the consideration and treatment by the Bureau and Commission of Plaintiffs, on the one side, and other applicants, on the other side, nor have they provided any reasonable explanation as to why Plaintiffs have been held to a different and higher standard from every other applicant.  Such disparate treatment is on-going as suitability hearings occur for additional applicants.  On information and belief, Wells' conduct in this regard has been and is influenced by Defendant Crosby.

### *Bureau and Commission Conduct Following Plaintiffs' Withdrawal*

68.     After receipt of the Bureau's recommendations and report on the evening of October 18, 2013, SSR requested that Plaintiffs and their related qualifiers withdraw from SSR's application for a category 1 gaming license, so that SSR could proceed with the project.

69.     While believing the Bureau's position was wholly without merit, and while intending to appear before the Commission to advocate for a finding of suitability, Plaintiffs acknowledged SSR's concerns, and acquiesced in their partners' request that they withdraw.

70.     The news of Plaintiffs' withdrawal spread quickly, and immediately became the headline story on the Boston Globe's news website, boston.com, and on the local evening news programs in the Boston market.

71.     On October 29, 2013, the Commission held an adjudicatory hearing on the SSR application.

72.     After Plaintiffs' withdrawal, Plaintiffs and Caesars were advised that it was unnecessary for them to appear at the hearing, since issues pertaining to Plaintiffs' suitability would not be the focus of the hearing.    In reliance on that advice, Plaintiffs and Caesars did not appear or ask to be heard, believing that this would be the least disruptive course of action.

73.     Contrary to the advice provided, the hearing involved an extensive assault on Plaintiffs' and Caesars' integrity, with them having no opportunity to rebut the misstatements and misimpressions made during the hearing.    These included misstatements and misrepresentations made by Defendant Crosby.

74.     For example, during the hearing, the Gansevoort trademark licensing agreement was discussed extensively.    According to Defendant Crosby, this discussion was necessary "because it's important for people to understand who knew what when."    In the course of that

discussion, Crosby distorted the historical record, stating that "our Investigations Bureau raised the issue at least of the Gansevoort question with Caesars with some significant force in April, six months ago."

75.     Defendant Crosby's statement was false.  In April 2013, Spectrum questioned certain of Caesars' employees and certain members of Caesars' Compliance Committee regarding several issues, including the Gansevoort trademark licensing agreement.  Based on these questions, Donovan wrote a letter to Spectrum on May 31, 2013, which provided further detail on Caesars' extensive due diligence review and compliance process for the Gansevoort Principal and Gansevoort.   In that letter, Donovan requested that Spectrum contact him respecting any issue that remained after receipt of the letter.  A copy of that letter was also sent to Wells.  Neither Spectrum, Wells nor the Bureau contacted Donovan.  No issue respecting the Gansevoort trademark licensing agreement was raised by the Bureau, Spectrum or anyone else again with Donovan until the September 24, 2013 telephone call with Wells.

76.     At SSR's October 29, 2013 suitability hearing, Defendant Crosby also baselessly impugned the integrity and competence of Caesars' Compliance Committee, stating that in order to "protect against slipping" standards, it is important to "empower" people who are willing to "say the unpopular thing," and implying that Caesars' Compliance Committee lacks such individuals.

77.     Caesars' Compliance Program has been reviewed and approved by regulators in Mississippi, Nevada and New Jersey, and has been repeatedly reviewed by regulators in other jurisdictions as part of routine regulatory reviews.   Caesars' Compliance Committee is comprised of some of the most experienced regulatory experts in the world.  At present, the Compliance Committee consists of five members, all of whom are independent of Caesars'

management and report directly to Caesars' Board of Directors.  The members include:  (1)  a former and the longest-serving Chair of the Nevada Gaming Control Board; (2) a former Member and Deputy Chief of the Nevada Gaming Control Board; (3) a former bank chairman; (4) a former business executive in the food and drug retail area; and (5) a former Supervisory Special Agent of the Federal Bureau of Investigation, who served as Managing Director of the Compliance Department for Park Place Entertainment, Inc., a predecessor company to Caesars from 1998 through 2000 and as Chief Compliance and Regulatory Officer of Caesars from 2000 through 2005.

78.    Defendant Crosby's suggestion that the members of the Compliance Committee are either incapable of making difficult decisions or unwilling to "say the unpopular thing" was untrue, and served to impugn Caesars' reputation without basis.  His statement in a public forum was also at odds with the Bureau's report, which states that its investigators found that "the Compliance Department conducted appropriate due diligence in this matter."

79.    Wells also withheld material information at the hearing, and from Plaintiffs. Specifically, she failed to disclose that Spectrum had, in fact, and as detailed more fully below, recommended to the Bureau that the latter recommend a finding of suitability to the Commission regarding Plaintiffs.  Instead of disclosing this critical information, Wells repeated her statement that Plaintiffs had failed to meet their burden of proving suitability.  She neither disclosed what Spectrum's actual recommendation had been, nor did she explain why the Bureau disregarded Spectrum's recommendation.   Upon information and belief, Wells withheld Spectrum's recommendation and failed to disclose that recommendation after consultation with Defendant Crosby.

80.     On Election Day, November 5, 2013, referenda were held in East Boston and in Revere on the SSR project.  While voters in Revere approved the SSR project, voters in East Boston rejected it by a wide margin.

81.     The "No" vote in East Boston left confusion and uncertainty about the SSR project, in particular as to whether and how the project might proceed on the Revere portion of the SSR site.

82.     The "No" vote in East Boston left the Everett Applicant's group as the leading contender for the category 1 license in Region A.

### Spectrum's Actual Recommendation

83.     After Plaintiffs had withdrawn from the application process and after the votes in East Boston and Revere, Plaintiffs learned that Spectrum had in fact recommended that Plaintiffs be found suitable.  The statements from these Spectrum officials were contrary to Plaintiffs' previous understanding, gained from communications with Wells, as to the nature of Spectrum's suitability recommendation to the Bureau.

84.     At no point has Wells or any other official of the Bureau or the Commission disclosed Spectrum's favorable recommendation or explained the Bureau's decision to reject that recommendation; and to date, the Bureau and the Commission have not disclosed Spectrum's recommendations.

### Disclosure of Chairman Crosby's Conflict

85.     On October 22, 2013, shortly after Plaintiffs' withdrawal, Defendant Crosby contacted the State Ethics Commission and privately disclosed his long-standing business and personal relationships with Lohnes and the possible conflicts of interest that they posed in his evaluation of the various applications in Region A.

86.     The Ethics Commission responded on October 24, 2013, and recommended providing more details about the relationships, Lohnes' involvement in the proposal and development, and particular issues that had arisen or were anticipated.  The Ethics Commission indicated that Defendant Crosby could then continue to perform his duties "using objective criteria when you do so."

87.     On October 25, 2013, Defendant Crosby filed another disclosure, adding the name of the business in which he had partnered with Lohnes, the fact that they had recently run into each other in the Commission offices, and that the site owned by Lohnes, the site of a former manufacturing facility, apparently has significantly greater value with a gaming license than with other plausible uses.

88.     In November 2013, the land in Everett came under increasing scrutiny when it was reported that federal agents and the state attorney general were investigating whether the land in which Lohnes holds an interest also had a secret investor with a criminal record including assault with a deadly weapon and identity theft.  Most recently, in October 2013, the subject individual had been arrested for assault and battery for punching an organizer of a pro-SSR rally in Revere.  When the investigation came to light on November 22, 2013, Defendant Crosby commented to the media that "[i]t didn't have anything to do with Wynn.  This is nothing Wynn knew about."

89.     On December 5, 2013, in a blog posted on the Commission's website, Defendant Crosby announced that he was recusing himself from the December 13, 2013 public meeting concerning the Everett Applicant's land transaction in Everett and its renegotiation following the investigation of the alleged secret investor.  The statement about the concerns over the land ownership includes the parenthetical statement that it "involved, among others, an individual

with whom I had a business relationship 23 years ago." He adds "[b]ecause of my prior business relationship with one of the parties, I immediately recused myself from all Commission and staff deliberations on this matter, and filed the required disclosure documentation with my appointing authority, the Governor, and with the State Ethics Commission," referring to the August and October 2013 disclosures and the Ethics Commission's October 24, 2013 letter, which are linked to the blog.   This constituted the first public disclosure of Crosby's conflict.  The timing of this disclosure, more than a year after Crosby knew of the conflict, is itself tainted, because Crosby's adverse actions affecting Plaintiffs, as alleged above, preceded the disclosure.

90.     In conducting the suitability review of Plaintiffs, Defendant Crosby and Wells were acting under color of state law.

91.     These actions, both coordinated and uncoordinated, under color of the Commission's regulatory and investigatory powers, have deprived Plaintiffs of the economic value of their investments in and respecting SSR, including tens of millions of dollars expended to support SSR's application process.

92.     These deliberate actions to deprive Plaintiffs of their constitutional rights are so flagrant and offensive as to shock the conscience and compel judicial intervention.

## COUNT I

**Violations of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution (Procedural and Substantive Due Process) v. Defendant Crosby in His Official and Individual Capacities**

93.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

94.     By virtue of Plaintiffs' compliance with the Gaming Act and the investment of tens of millions of dollars in the license application process, Plaintiffs were possessed of

property rights, *inter alia*, in their business association with SSR and to non-discriminatory, unbiased and fair consideration in the license application process.  Plaintiffs do not claim a property right in the Region A gaming license.

95.     Defendant Crosby's conduct under color of state law, as more fully alleged above, constituted discriminatory, biased and unfair disruption of Plaintiffs' participation in their business association with SSR and in the licensing process.

96.     Defendant Crosby's conduct under color of state law, as more fully alleged above, violated Plaintiffs' constitutionally protected property rights as secured under the Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

97.     By manipulating and abusing his investigatory and adjudicatory power to interfere with Plaintiffs' and their partners' category 1 gaming application, Defendant Crosby has deprived Plaintiffs of the enjoyment of their constitutionally protected property rights without due process of law.

98.     Defendant Crosby has intentionally and wrongfully singled out Plaintiffs for adverse treatment relating to their protectable and legitimate interests in the fair and impartial consideration of Plaintiffs' suitability to participate as a partner in the SSR application for a category 1 gaming license.

99.     Defendant Crosby's adverse treatment of Plaintiffs was and is arbitrary and irrational, without authority under the law, and motivated by malicious and bad faith intent to block the fair and impartial consideration of SSR's application.

100.     Defendant Crosby's intentional misconduct has violated Plaintiffs' procedural due process rights to an application process that is non-discriminatory, unbiased and fair.

101.    Defendant Crosby's intentional misconduct has violated Plaintiffs' substantive due process right not to be deprived of the use of their property except by laws, regulations or government actions that are rationally related to a legitimate governmental interest.

102.    Plaintiffs have suffered, and continue to suffer, economic and reputational injuries as a result of Defendant Crosby's wrongful acts and omissions for which Defendant Crosby is liable under the provisions of 42 U.S.C. § 1983.

## COUNT II

**Violations of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution (Equal Protection) v. Defendant Crosby in His Official and Individual Capacities**

103.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

104.    By virtue of, *inter alia*, Plaintiffs' compliance with the Gaming Act and the investment of tens of millions of dollars in the license application process,  Plaintiffs were possessed of a property right in their business association with SSR and to non-discriminatory, unbiased and fair consideration in that process.

105.    Defendant Crosby's conduct under color of state law, as more fully alleged above, constituted, and continues to constitute on a going-forward basis, discriminatory, biased and unfair disruption of Plaintiffs' business association with SSR and participation in the licensing process, thereby denying Plaintiffs equal protection of law.

106.    Defendant Crosby's conduct under color of state law, as more fully alleged above, violated, and continues to violate, Plaintiffs' constitutionally protected equal protection rights as secured under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

107.     Defendant Crosby's past and future disparate treatment of Plaintiffs, including his discriminatory, arbitrary and capricious handling of Plaintiffs' pursuit of a suitability determination, has denied, and continues to deny, Plaintiffs their right to equal protection of law.

108.     Defendant Crosby has intentionally and wrongfully singled out Plaintiffs for adverse treatment relating to their protectable and legitimate interests in the fair and impartial consideration of their suitability to participate as partners in the SSR application for a category 1 license.

109.     Defendant Crosby's adverse treatment of Plaintiffs was and is arbitrary and irrational, without authority under the law, and motivated by malicious and bad faith intent to block the fair and impartial consideration of SSR's application for a category 1 license.

110.     Defendant Crosby's actions and statements have violated, and continue to violate, Plaintiffs' right to equal protection of the laws as guaranteed under the United States Constitution.

111.     Plaintiffs have suffered and continue to suffer economic and reputational injuries as a result of Defendant Crosby's wrongful acts and omissions for which Defendant Crosby is liable under the provisions of 42 U.S.C. § 1983.

## COUNT III

### Declaratory Relief v. Defendant Crosby in His Official Capacity

112.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

113.     Actual controversies exist between Plaintiffs and Defendant Crosby with respect to whether Defendant Crosby's conduct as more fully alleged above violated, and continues to violate, Plaintiffs' due process and equal protection rights and constitutes an unlawful taking, all

causing Plaintiffs and their affiliates economic and reputational injury. Because the Bureau is expressly authorized to "provide pertinent information regarding applicants or licensees from or to law enforcement entities or gaming authorities and other domestic, federal or foreign jurisdictions, including the Federal Bureau of Investigation, and may transmit such information to each other electronically," M.G.L. c. 32K, § 6(e), the violation of Plaintiffs' rights continues because the Bureau's report remains a part of the public record and subject to distribution to other regulatory bodies and law enforcement agencies.

114.    Such controversies are ripe for determination, and should be determined as soon as feasible.

115.    These controversies have caused, and threaten to continue to cause, damage to Plaintiffs.

116.    Plaintiffs have not made a prior application for the relief sought herein to this Court or any other court.

117.    In support of the injunctive relief requested hereafter, Plaintiffs request entry of declaratory judgments that:

   a.   the suitability process as to Plaintiffs was constitutionally flawed; and

   b.   the Bureau's suitability report issued as to Plaintiffs and Caesars is a nullity, entitled to no force or effect.

## COUNT IV

**Injunctive Relief Pursuant to 28 U.S.C. §§ 1651 and 1983 v. Defendant Crosby in His Official Capacity**

118.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

119.    Plaintiffs have been, and continue to be, irreparably injured as a result of the deprivation of their constitutional rights by Defendant Crosby.

120.    As Plaintiffs do not have an adequate or complete remedy at law to redress the violations of their constitutional rights as outlined above, this suit for injunctive and supporting declaratory judgment is their only means of securing complete and adequate relief.

121.    By his actions, Defendant Crosby has caused the issuance of, and has not withdrawn, a report which wrongfully states that Plaintiffs did not meet their burden of proving suitability to participate in a category 1 license application, when in fact such report was not a product of any failure on Plaintiffs' part but rather was the result of an unfair, discriminatory and biased process.

122.    No other remedy would offer Plaintiffs complete protection from the continuation of Defendant Crosby's unlawful and unconstitutional acts, policies and practices.

123.    Considering the balance of hardships between Plaintiffs and Defendant Crosby, the requested remedy in equity is warranted, and the public interest would be served by the requested injunction.

124.    For these reasons, Plaintiffs request a permanent injunction

    a.    prohibiting Defendant Crosby from relying upon, providing to others (including other gaming commissions and their investigative arms), or disseminating the constitutionally flawed Bureau Report; and

    b.    ordering the withdrawal and permanent sealing of the Bureau's suitability report as to Plaintiffs.

## COUNT V

**Tortious Interference With Advantageous Relations v. Defendant Crosby in His Individual Capacity**

125.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

126.     Plaintiffs had an advantageous business relationship with their partners in SSR, which, without regard to whether a license was ultimately obtained by the partnership, would have permitted Plaintiffs to participate fully in the application process, without injury to their reputations in the gaming community, in Boston and worldwide.

127.     Defendant Crosby, acting outside the scope of his official employment, knew about and intentionally interfered with Plaintiffs' advantageous relationship with SSR, leading to Plaintiffs' withdrawal from the relationship.

128.     Defendant Crosby's interference was accomplished using improper means.

129.     Defendant Crosby's interference was inspired by improper motives.

130.     Plaintiffs have suffered, and continue to suffer, economic and reputational injuries as a result of Defendant Crosby's conduct.

131.     Plaintiffs were harmed, and continue to suffer harm, as a result of Defendant Crosby's actions.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Enter judgment on each and every Count of the Complaint in Plaintiffs' favor and award them such damages against Defendant Crosby personally as may be proven at trial.

2.      Enter a declaratory judgment determining the rights of the parties and declaring that (a) the suitability process as to Plaintiffs was constitutionally flawed, and (b) the Bureau's suitability report issued as to Plaintiffs is therefore a nullity, entitled to no force or effect;

3.      Enter a permanent injunction (a) prohibiting Defendant Crosby, directly or through others, from relying upon, providing to others (including other gaming commissions and their investigative arms), and disseminating the constitutionally flawed Bureau report;  and (b) ordering the withdrawal and permanent sealing of the Bureau's unconstitutionally flawed suitability report as to Plaintiffs,

4.      Order Defendant Crosby to pay Plaintiffs' reasonable costs and attorneys' fees; and

5.      Grant Plaintiffs such other, further and different relief as may be just and appropriate.


PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES AND CLAIMS SO TRIABLE.

Respectfully submitted,

Dated: December 11, 2013

CAESARS MASSACHUSETTS
MANAGEMENT COMPANY, LLC,
CAESARS MASSACHUSETTS
DEVELOPMENT COMPANY, LLC, and
CAESARS MASSACHUSETTS
INVESTMENT COMPANY, LLC,

By their attorneys,

/s/ Joan A. Lukey_____
Joan A. Lukey (BBO # 307340)
Christopher Thomas Brown (BBO # 667558)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Tel: (617) 951-7000
Joan.Lukey@ropesgray.com
Thomas.Brown@ropesgray.com