**United States District Court**
**District of Massachusetts**

```
_____
                                )
CAESARS MASSACHUSETTS           )
DEVELOPMENT COMPANY, LLC,       )
CAESARS MASSACHUSETTS MANAGEMENT)
COMPANY, LLC, CAESARS           )
MASSACHUSETTS INVESTMENT        )
COMPANY, LLC, and CAESARS       )
ENTERTAINMENT CORPORATION,      )
                                )
          Plaintiffs,           )
                                )
          v.                    )   Civil Action No.
                                )   13-13144-NMG
STEPHEN P. CROSBY, in his       )
personal capacity and official  )
capacity as CHAIR OF THE        )
MASSACHUSETTS GAMING COMMISSION,)
and KAREN WELLS, in her personal)
capacity and official capacity  )
as DIRECTOR OF THE              )
INVESTIGATIONS AND ENFORCEMENT  )
BUREAU OF THE MASSACHUSETTS     )
GAMING COMMISSION               )
                                )
          Defendants.           )
_____ )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This case involves a dispute between four entities affiliated with casino operator Caesars (collectively, "plaintiff" or "Caesars") and the Massachusetts Gaming Commission ("the Gaming Commission") over an alleged, late-disclosed conflict of interest of Stephen Crosby ("Crosby"), the Chair of the Commission.

Caesars sought to participate in the application for a casino license in East Boston, Massachusetts submitted by Sterling Suffolk Racecourse, LLC ("SSR").  When the Gaming Commission's Investigation and Enforcement Bureau ("the IEB") investigated Caesars for its "suitability" as a casino operator, it uncovered several allegedly unsavory details about Caesars' operations which it included in its Suitability Report.  On that basis, IEB Director Karen Wells ("Wells") advised SSR that its application would not be approved if Caesars remained as its partner.  As a result of that disclosure, SSR asked Caesars to withdraw and Caesars agreed.

Believing that Crosby and Wells (collectively "defendants") rigged the application process against it, Caesars brings suit against them both in their official and individual capacities for alleged violations of procedural due process and substantive due process (Counts I & II) and equal protection (Counts III & IV) and against Crosby in his individual capacity for tortious interference with a business relationship (Count IX).  Plaintiff seeks declaratory relief (Counts V & VI) and injunctive relief (Counts VII & VIII) declaring the Suitability Report a nullity and barring defendants from any future dissemination of that report.

Pending before the Court is defendants' motion to dismiss plaintiff's claims as barred by Eleventh Amendment sovereign

immunity and individual qualified immunity or, in the
alternative, as failing to state a claim upon which relief can
be granted.

The Court finds that plaintiff's claims against defendants
in their official capacities are barred by the prohibition of
retrospective relief against an unconsenting state under the
doctrine of sovereign immunity and that Crosby is entitled to
the protection of qualified immunity in his personal capacity
because his allegedly improper actions were not in violation of
a clearly established right.

Although the Court is disturbed by Crosby's failure to
avoid the appearance of impropriety and convinced that public
trust in the casino licensing process has suffered as a result,
it is not empowered to pass legal judgment on his ethical
lapses.  It must apply the law, even where it shields from
liability those who certainly should have known better.
Defendants' motion to dismiss will be allowed.

## I.   **Background**

### A.   **The Gaming Act**

In 2011, Governor Deval Patrick signed into law the Act
Establishing Expanded Gaming in the Commonwealth ("the Gaming
Act") which created the Gaming Commission and authorized it to
issue one casino license in each of three regions in

Massachusetts, including Region A which covers the Greater Boston area. Mass. St. 2011, c. 194; M.G.L. c. 23K, § 1.

As part of the casino license application process, applicants and certain business partners, termed "qualifiers," must be investigated and their "suitability" established.  Those investigations are conducted by the IEB and private contractors it supervises, after which it makes a recommendation as to suitability to the Gaming Commission.

The Gaming Act establishes a two-part application process to secure a casino license.  In the first phase, the suitability of each applicant and any qualifiers must be determined.  To determine an entity's suitability, the IEB is authorized to consider any factor, "without limitation," that bears on an entity's qualifications or reputation, including its integrity, character, financial stability, business practices and history of compliance with gaming rules in other jurisdictions. M.G.L. c. 23K, § 12(a).

The IEB must submit a written report to the Gaming Commission providing recommendations as to the suitability of each applicant and qualifier.  The Gaming Commission then initiates the process for holding a public hearing on the relevant application.  If an applicant contests the findings in a report, it may file a notice of claim within 30 days and

receive an adjudicatory proceeding on its complaint before the Commission. See 205 CMR § 115.04(2), (3).

After receiving the IEB's recommendation and holding a public hearing, the Gaming Commission must then make a determination as to each entity's suitability.  It need not accept IEB's recommendation.  All applicants and qualifiers must be deemed suitable for an application to be approved. Suitability must be proven by clear and convincing evidence. M.G.L. c. 23K, § 12, 13; 205 CMR § 115.

If an applicant and its qualifiers are deemed suitable, the Gaming Commission then evaluates the merits of the application in the second phase, considering a range of factors including the proposed casino's projected revenues and job creation and the expected impact on host and surrounding communities.  The Gaming Commission need not award any casino licenses if the applicants in a particular region do not meet the relevant criteria which consist of a variety of factors including a proposed casino's effect on the local economy, traffic, environment, crime rate and tax base. M.G.L. c. 23K, § 18(1)- (19). The Gaming Commission's determinations are not subject to review. Id. § 17(g); 205 CMR § 115.05(5).

In all of its actions, the commissioners of the Gaming Commission are required to "avoid impropriety and the appearance of impropriety in all matters under their jurisdiction." M.G.L.

-5-

c. 23K, § 3(u).  Commissioners must recuse themselves from proceedings in which their impartiality "might reasonably be questioned [or] in which a potential conflict of interest exists." Id.

The Gaming Act also authorizes the IEB to "obtain or provide pertinent information" with respect to applicants or licensees from or to relevant state agencies in "other domestic, federal or foreign jurisdictions." Id. § 6(e).

**B.   Factual Background**

All Caesars entities listed as plaintiffs are Delaware limited liability companies or Delaware corporations with their principal place of business in Las Vegas, Nevada.  Defendant Crosby is a Massachusetts resident who, since 2011, has served as the Chair of the Gaming Commission.  Defendant Wells is a Massachusetts resident who has served at all times material to this case as the Director of the IEB.

Plaintiff's allegations against defendants, as stated in the Third Amended Complaint, are recounted below.[1]  The Court accepts plaintiff's well-pled facts as true for present purposes.  The allegations center on the belatedly disclosed relationship between Crosby and Paul Lohnes ("Lohnes"), Crosby's

---

[1] The Court will allow plaintiff's motion for leave to file a Third Amended Complaint (Docket No. 60) and, accordingly, considers the facts in this case in light of plaintiff's updated allegations.

friend and former business partner, and the alleged efforts of defendants to ensure that Lohnes would benefit from the casino license awarded in Region A.

Crosby and Lohnes initially became acquainted during their service in the National Guard in the 1970s.  From approximately 1983 to 1990, Lohnes was Crosby's business partner at the Crosby Vandenburgh Group and served as the company's treasurer. Plaintiff characterizes Lohnes as having "saved" the company through his involvement.

Currently, Lohnes is the part-owner of a vacant industrial site in Everett which was marketed as a casino site in Region A and he stands to profit handsomely from the property's sale. Crosby became aware of Lohnes partial ownership in August, 2012. At that time, Crosby, ostensibly to encourage competition for the Region A casino license, suggested that other casino operators consider filing applications in the Region.

In January, 2013, SSR submitted an application for a casino license in Region A at Suffolk Downs in East Boston, with Caesars identified as the casino operator and, therefore, a qualifier.  Prior to the submission of SSR's application, Caesars had invested significant funds in SSR.

In March, 2013, casino operator Steve Wynn ("Wynn") acquired an option to purchase the Everett site owned by Lohnes, conditioned upon receiving the Region A license.  In October,

2013, after Wynn expressed public doubts concerning the
viability of the casino license application process in
Massachusetts, Crosby placed a phone call to Wynn to encourage
him not to withdraw his application.

The IEB investigated Caesars' suitability with the
assistance of Spectrum Gaming Group LLC ("Spectrum"), a private
research firm it retained.  As part of the investigation, Wells
met with representatives of Caesars several times.  In October,
2013, shortly before the IEB issued its final report, Wells
informed Caesars that a determination of "unsuitable" was likely
forthcoming and that if it withdrew from the application
process, the IEB would issue a report without a recommendation
that Caesars be deemed "unsuitable."  At that time,
representatives from Spectrum informed Caesars that it had
advised IEB of no reasons to find Caesars unsuitable.  Caesars
initially declined to withdraw as a qualifier and on October 16,
2013, SSR requested an adjudicatory hearing on Caesars'
suitability to which it believed it was entitled within 30 days.
Wells responded that the Gaming Commission would hold a hearing
by the end of that month so as to resolve Caesars' "suitability"
before the November 5, 2013, referendum on the issue in East
Boston.

On October 18, 2013, at the conclusion of its nine-month
investigation, the IEB issued a report recommending a finding

that Caesars had not met its burden of proving suitability by clear and convincing evidence.  The IEB identified four areas of concern with respect to Caesars: (1) its decision to partner with Gansevoort Hotel Group, LLC, a company owned in part by an individual with ties to Russian organized crime groups; (2) its hiring of Mitchell Garber, who had entered into two non-prosecution agreements with the Department of Justice in prior positions; (3) its inappropriate accommodations to Kenneth Watanabe, a wealthy individual who gambled compulsively at Caesars' sites in Las Vegas; and (4) its significant corporate debt.  In the Third Amended Complaint, Caesars emphasizes that other more severely unsuitable applicants and qualifiers were treated more favorably by defendants.

The IEB recommended providing SSR with the opportunity to respond to the findings with respect to Caesars' suitability and to prove Caesars' overall suitability by clear and convincing evidence at a public hearing or, in the alternative, that Caesars withdraw from participation in SSR's application.

Daunted by the prospect of an unsuitable casino operator as its business partner, in October, 2013, SSR asked Caesars to withdraw from its application.  Caesars, apparently recognizing the futility of trying to mount a defense in the shortened time period before the public hearing, agreed to withdraw.

On October 29, 2013, the Gaming Commission held a public hearing on SSR's suitability.  Although Caesars had already withdrawn and it did not participate, Crosby made several negative comments about Caesars' suitability.  Caesars characterizes Crosby's words as an "extensive assault on Caesars' integrity."

SSR proceeded with its application, was deemed suitable by the Gaming Commission and is presently pursuing a casino license with another casino operator.

Plaintiff alleges that Crosby's conflict of interest as a result of his relationship with Lohnes has persisted throughout the casino license application process.  Crosby first disclosed his relationship with Lohnes to other members of the Commission and to Wells and IEB staff in August, 2013, one year after he became aware of the potential conflict.  Later that same month, Crosby disclosed his relationship with Lohnes privately to the Office of Governor Patrick.

On October 22, 2013, again privately, Crosby disclosed the relationship to the State Ethics Commission ("the Ethics Commission").  That disclosure was made the day after Caesars had withdrawn from its role as qualifier for SSR.  The Ethics Commission privately responded to Crosby on October 24, 2013, 1) recommending that he provide more details about his relationship with Lohnes and the latter's role in the potential development,

2) but emphasizing that Crosby could continue to act as Chair of the Gaming Commission "using objective criteria when you do so." Crosby filed another disclosure the next day, including additional details with respect to his relationship with Lohnes.

In December, 2013, Crosby disclosed to the public his relationship with Lohnes and the potential conflict of interest, recusing himself from participation in a public meeting concerning the Everett site.

On May 8, 2014, subsequent to the filing of the subject lawsuit, Crosby recused himself from any further involvement in the Region A casino license process.  He stated in a press release that his

> participation in the decision making process has become a distraction and a potential threat to [the] critical appearance of total impartiality.

Crosby continues to serve as Chair of the Gaming Commission in all other respects.

### C.   Procedural History

Plaintiff filed its original complaint on December 11, 2013, alleging a variety of unconstitutional misconduct by Crosby.  Shortly thereafter, on December 31, 2013, plaintiff filed an amended complaint which added substantially similar claims against Wells.

After some brief pretrial skirmishing over defendants' answer to the amended complaint, defendants moved to dismiss on

January 30, 2014.  On February 19, 2014, defendants moved to stay discovery pending the Court's disposition of the motion to dismiss.  A scheduling conference and hearing on defendants' motion to dismiss was held on February 26, 2014, at which time the Court denied defendants' motion to stay discovery, set a discovery schedule to proceed if plaintiff's complaint were to survive the motion to dismiss and took defendants' motion to dismiss under advisement.  Subsequently, the Court twice extended the previously set discovery deadlines.

After the hearing, at the direction of the Court, the parties proffered further briefing on the issue of whether or not M.G.L. c. 23k, § 6(e) renders plaintiffs subject to an ongoing violation of federal law.

On March 17, 2014, plaintiff moved for leave to file a Second Amended Complaint which the Court allowed over defendants' objections on March 25, 2014.  Thereafter, again at the direction of the Court, the parties submitted supplemental memoranda outlining the affect of the Second Amended Complaint on their previous arguments.

On May 6, 2014, defendants filed a notice of supplemental authorities with respect to a decision by another session of this Court in Town of Barnstable v. Berwick, 2014 WL 1779345 (D. Mass. May 2, 2014).  Plaintiff responded to that notice the following day.  On May 19, 2014, plaintiff moved for leave to

file a Third Amended Complaint which, after consideration, the Court will allow.[2]

## II.   <u>**Eleventh Amendment Immunity**</u>

Defendants contend that Caesars' claims are barred under the Eleventh Amendment which precludes claims for retrospective relief against a state or state agency without its consent. Plaintiffs respond that its claims are prospective because of the ongoing harm it suffers from the defendants' continuing dissemination of the unconstitutionally produced Suitability Report.

### A.   **Legal Standard**

The Eleventh Amendment bars suits against states in federal court without their consent or a valid abrogation by Congress. <u>Green</u> v. <u>Mansour</u>, 474 U.S. 64, 68 (1985). The Amendment's primary purpose was "to minimize federal courts' involvement in disbursal of the state fisc." <u>Metcalf & Eddy, Inc.</u> v. <u>P.R. Aqueduct & Sewer Auth.</u>, 991 F.2d 935, 939 (1st Cir. 1993). In addition, the Amendment's grant of sovereign immunity protects states from interference with "public administration." <u>Va. Office for Prot. & Advocacy</u> v. <u>Stewart</u>, 131 S. Ct. 1632, 1638 (2011). Under the well-known exception created by <u>Ex parte Young</u>, 209 U.S. 123 (1908), however, a state officer acting in

---

[2] On May 28, 2014, defendants filed a motion to extend the deadline for automatic discovery (Docket No. 61) but that motion is rendered moot by this memorandum and order.

an official capacity may be sued for prospective injunctive
relief to cease an ongoing constitutional violation. See Edelman
v. Jordan, 415 U.S. 651, 677 (1974).

To determine whether the Ex parte Young exception is met, a
court conducts a

> straightforward inquiry in to whether a complaint
> alleges an ongoing violation of federal law and seeks
> relief properly characterized as prospective.

Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997)
(O'Connor, J., concurring in part and concurring in the
judgment).  While an allegation of an ongoing violation of
federal law is "ordinarily sufficient," Verizon Md., Inc. v.
Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002), a court must
determine whether the alleged violation is truly ongoing or,
rather, "designed to remedy past violations of federal law."
Coeur d'Alene Tribe, 521 U.S. at 288 (O'Connor, J., concurring
in part and concurring in the judgment); see also Papasan v.
Allain, 478 U.S. 265, 277-78 (1986) (distinguishing cases where
a violation is "ongoing" from those "in which federal law has
been violated at one time or over a period of time in the
past").  In essence, the exception created by Ex parte Young
"does not permit judgments against state officers declaring that
they violated federal law in the past." P.R. Aqueduct & Sewer
Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).

The Eleventh Amendment jurisprudence of the First Circuit Court of Appeals has generally tracked that of the Supreme Court and emphasized the importance of the difference between prospective and retrospective relief. See, e.g., Whalen v. Mass. Trial Court, 397 F.3d 19, 28-29 (1st Cir. 2005) ("The [Supreme] Court has described the difference between permissible and impermissible relief as 'the difference between prospective relief on one hand and retrospective relief on the other.'") (citing Quern v. Jordan, 440 U.S. 332, 337 (1979)); Greenless v. Almond, 277 F.3d 601, 607 (1st Cir. 2002) ("[A]n Ex parte Young plaintiff may obtain prospective, but not retrospective, relief."); Doucette v. Ives, 947 F.2d 21, 30-31 (1st Cir. 1991) (noting that injunctive or declaratory relief is barred when it relates "exclusively to the state's past practices").

Plaintiff, however, points this Court to the contrary case of Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464 (1st Cir. 2009), in which the First Circuit held that

> because no state funds are implicated by the district court's order, we hold that the Eleventh Amendment's prohibition against retrospective relief does not apply.

At first glance, Irizarry appears difficult to reconcile with an Eleventh Amendment jurisprudence firmly rooted in the prospective/retrospective distinction.  Indeed, its holding

seems based entirely on the absence of any impact on the state treasury.

This Court concludes, however, that Irizarry did not work the sea change in Eleventh Amendment jurisprudence that plaintiff supposes.  Notably, the Irizarry court did not purport to overrule, or even challenge, any existing First Circuit precedent.  Indeed, the panel seemed of the opinion that the case fit, albeit perhaps uncomfortably, within the body of the circuit's precedents.  Prior First Circuit law not addressed, let alone overruled, in Irizarry, had barred a suit under the Eleventh Amendment despite the lack of a claim for monetary relief. See Whalen, 397 F.3d at 29 (barring a claim under the Eleventh Amendment despite plaintiff explicitly "seek[ing] no monetary reward").

Furthermore, subsequent First Circuit opinions addressing the Eleventh Amendment have expressly disclaimed plaintiff's interpretation of Irizarry. See, e.g., Coggeshall v. Mass. Bd. of Registration of Psychologists, 604 F.3d 658, 662 n.4 (1st Cir. 2010) ("We do not imply that the Eleventh Amendment bars claims only for money damages.  That is not the case.").

One sentence in Irizarry does not re-constitute the law of sovereign immunity in this circuit.  Instead, it is merely one piece in a dense mosaic which, taken as a whole, presents a standard for application of Ex parte Young that stands in

tension with plaintiff's interpretation.  The Court acknowledges that the Supreme Court has cautioned that the difference between barred relief and an acceptable remedy "is not always self-evident." Florida v. Long, 487 U.S. 223, 238 (1988).  The Court is confident, however, that, at least in this circuit, sovereign immunity does not turn only on a claim of money damages.

Accordingly, the "pivotal question" in deciding the prospective or retrospective character of the requested relief is "whether the requested relief would directly bring an end to an ongoing violation of federal law." Hootstein v. Collins, 670 F. Supp. 2d 110, 114 (D. Mass. 2009) (citing Papasan, 478 U.S. at 278).

**B.  Application**

The parties' dispute over Eleventh Amendment immunity centers on the distinction between prospective and retrospective relief.  Plaintiff argues that its requested relief is patently prospective, noting that it seeks declaratory and injunctive relief to remedy the on-going harm caused by the fact that defendants continue to disseminate and rely upon the constitutionally flawed report.  Plaintiff underscores that dissemination of that report is enshrined in § 6(e) of the Gaming Act which authorizes the IEB to "obtain or provide" information to other gaming or law enforcement agencies.  It summarizes its argument colorfully, noting that it seeks "to

-17-

stop the bleeding, not to charge the Commonwealth for the blood already spilled."

Defendants counter that while plaintiffs may characterize this case as one of ongoing violations, the alleged violation actually occurred between January and October, 2013. According to defendants, Caesars is no longer subject to their control and anything it alleges as an ongoing harm is a mere side effect.

The Court finds no continuing violation of federal law but, rather, at most a past violation the record of which continues to be available and have ongoing effects. Plaintiff's claim is that the Gaming Commission, led by defendants, made an unconstitutionally biased determination that Caesars was not suitable as a qualifier for SSR's casino license application. That determination, however, is "now an historical fact." See Tyler v. Massachusetts, 2013 WL 5948092, at *2 (D. Mass. Nov. 7, 2013). In light of the allegation that the suitability investigation was conducted unconstitutionally, plaintiff's requested relief cannot ensure future compliance with a substantive legal question. See Milliken v. Bradley, 433 U.S. 267, 289 (1977); see also Edelman v. Jordan, 415 U.S. 651, 664 (1974) (noting that Ex parte Young enjoined the Attorney General of Minnesota "to conform his future conduct of that office to the requirement of the Fourteenth Amendment").

Notably, plaintiff's complaint includes no allegation that it continues to be subject to the control or jurisdiction of the Gaming Commission, meaning that an injunction against defendants would not affect plaintiff's substantive rights.

Plaintiff's argument, moreover, seeks to prove too much. If it is correct, then <u>any</u> decision constituting a violation of law, no matter how distant in the past, would constitute an ongoing violation simply because the record of its occurrence remains available as a matter of historical record. That result, as defendants respond, would render the Eleventh Amendment's bar to retrospective relief meaningless in an era when placing an administrative decision on the internet is the rule, not the exception.

A court in the Southern District of New York, <u>Nat'l R.R. Passenger Corp.</u> v. <u>McDonald</u>, 2013 WL 5434618, at *11 (S.D.N.Y. Sept. 26, 2013), recently addressed a similar issue and both parties have fought to bring the case into their respective camps. In evaluating whether a complaint for a declaratory judgment against a previous, allegedly unlawful taking, the <u>McDonald</u> court distinguished between the taking and its "ongoing effects." <u>Id.</u> at *14. Those effects were simply a "by-product" and do not "constitute an 'ongoing' violation of law, separate and apart from the taking itself." <u>Id.</u> Although the facts of <u>McDonald</u> are different from those at bar, the observations of

-19-

the <u>McDonald</u> court cut in favor of defendants' contentions.  <u>See</u>
<u>Town of Barnstable</u> v. <u>Berwick</u>, 2014 WL 1779345, at *5-6 (D.
Mass. May 2, 2014 (distinguishing a "continuing violation" of
federal law from a past violation with "ongoing effects").

Plaintiff points to <u>Gomes</u> v. <u>Univ. of Me. Sys.</u>, 304 F.
Supp. 2d 117 (D. Me. 2004), as decisive support for its
argument.  In <u>Gomes</u>, the district court found that a seemingly
retrospective injunction was available to plaintiff to "expunge"
an adverse action from the university's academic records
because, although the relevant conduct occurred in the past, it
had an ongoing effect on plaintiff. <u>Id.</u> at 122.  <u>Gomes</u> is
distinguishable from the case at bar, however, because it was
clear that the <u>Gomes</u> plaintiff was subject to continuing
authority by defendant, whereas here there is no such
allegation.  Plaintiff merely asserts that defendants are
continuing to disseminate the Suitability Report which, as
noted, is at most documentation of a <u>past</u> violation of
plaintiff's rights.

Moreover, to the extent that <u>Gomes</u> is relevant, its
interpretation is not binding on this Court.  The Supreme Court
has admonished courts to examine "the substance rather
than...the form of the relief sought." <u>Papasan</u>, 478 U.S. at 279.
This Court does so here.

Accordingly, plaintiff's official capacity claims against defendants will be barred under the Eleventh Amendment's grant of sovereign immunity.

## III. <u>Qualified Immunity</u>

Defendants assert that the claims against Crosby and Wells in their individual capacities are barred under the doctrine of qualified immunity.  Plaintiffs respond that the right at issue is sufficiently "clearly established" to allow this case to proceed.

### A.   Legal Standard

To evaluate a qualified immunity claim, a court must decide whether (1) the facts alleged show conduct in violation of a constitutional right and (2) the right violated was clearly established at the time of the alleged violation. <u>Maldonado</u> v. <u>Fontanes</u>, 568 F.3d 263, 269 (1st Cir. 2009).

The latter step comprises two separate inquires: first, whether the state of the law was sufficiently clear so as to provide notice to would-be violators and, second, whether a reasonable officer would understand that the challenged conduct violated the clearly established right at issue. <u>Id.</u>  A right may be clearly established without a directly apposite case but "existing precedent must have placed the statutory or constitutional question beyond debate." <u>Stanton</u> v. <u>Sims</u>, 134 S. Ct. 3, 5 (2013).  The second step is fact-sensitive, not a

"broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds, Pearson v. Callahan, 555 U.S. 223 (2009).  In other words, a court must ask "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." Maldonado, 568 F.3d at 269.

The doctrine of qualified immunity balances the need to hold public officials accountable for abusing their power and the need to protect officials from litigation and, ultimately, liability when they act reasonably. See Pearson, 555 U.S. at 231.  The doctrine's protection for reasonable mistakes by public officials

> applies whether the government official's error is a
> mistake of law, a mistake of fact, or a mistake based
> on mixed questions of law and fact.

Id. (international quotation marks and citation omitted).  It protects "all but the incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

In assessing a motion to dismiss on qualified immunity grounds, the Court must accept the well-pled facts of the plaintiff's complaint. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  Courts reject the legal conclusions or "naked assertion[s]" of a complaint devoid of "further factual enhancement." Soto-Torres v. Fraticelli, 654 F.3d 153, 156 (1st Cir. 2011) (citing Iqbal, 556 U.S. at 698).

B.   **Application**

The Court will first address the question of whether plaintiff has pled sufficient facts to state a violation of its constitutional rights to procedural due process, substantive due process and equal protection.  It will then determine whether the rights at issue are sufficiently clearly established to give fair warning to a reasonable officer that his or her conduct would constitute a violation.

1.   **Constitutional Violations**

a.   **Procedural Due Process**

Stating a valid claim for a deprivation of procedural due process requires the plaintiff (1) to identify a protected liberty or property interest and (2) to allege that the defendants deprived the plaintiff of that interest without constitutionally adequate process. Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011).

Caesars alleges that the actions of the Gaming Commission officials deprived it, without adequate due process, of its property interests with respect to (1) its "business association with SSR" and (2) "non-discriminatory, unbiased and fair consideration in the license application process."  Defendants respond that (1) neither purported interest is "property" protected by due process, (2) even if Caesars held such property, it was taken by SSR, a private actor, not defendants,

-23-

and (3) Caesars received adequate process and did not avail itself of state law procedures.

### i.    Interest in Property

To state a due process claim, a plaintiff must first have a "legitimate claim of entitlement" to property, Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972), which must stem from "an independent source such as state law." Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005).  In this case, the parties dispute whether Massachusetts law provides Caesars with a protected property interest.

Specifically, plaintiff claims that two property interests existed: (1) that its contract with SSR created a property interest and (2) that SSR's application to the Gaming Commission created an implied contract of which Caesars' was a party. Defendants contest plaintiff's first contention as insufficient, arguing that the Gaming Act did not intend to guarantee "an intact private association" between an applicant and a qualifier.  Defendants counter plaintiff's second assertion, emphasizing the distinction between applicants, who possess implied contract rights, and qualifiers, who do not.

Caesars undoubtedly had a property interest in its contractual relationship with SSR.  Simply put, SSR and Caesars had a contract and a contract creates a property interest. See Brown v. Sweeney, 526 F. Supp. 2d 126, 131 (D. Mass. 2007).

Moreover, defendants later concede that an applicant for a casino license receives an "implied contractual right" to proper treatment which is "a form of property under Massachusetts law." If that is true, then an actual contract must also create a property interest.

Plaintiff's property interest in the due consideration of the casino license application is a closer issue. Defendants concede that an applicant possesses an

> implied contractual right to Commission action on their applications in accordance with statutory and regulatory criteria

but emphasize that this right attaches to applicants only, not to qualifiers such as Caesars. This implied right, according to defendants, exists only vis-à-vis applicants because they submit an independent application, have some expectation of receiving a casino license and have paid a non-refundable application fee and the costs of the investigation. Caesars rejects that formalistic argument, noting that it has invested "tens of millions" of dollars into SSR's casino license application which makes it subject to the same concerns identified by defendants as applicable to applicants.

While no clear winner emerges, the Court finds that the sparse caselaw extant favors Caesars. There is no debate that SSR, under Massachusetts law, had a property right in its implied contract by submitting a casino license application to

the Gaming Commission.  That property right exists by analogy to

Massachusetts public bidding laws which imbue an "implied

condition" upon public invitations for bids whereby each bid is

entitled to be "fairly considered in accordance with all

applicable statutes." Paul Sardella Constr. Co., Inc. v.

Braintree Hous. Auth., 3 Mass. App. Ct. 326, 333 (1975).  If the

implied right is violated, the proper remedy is the "recovery of

bid preparation costs." Id.  In situations of bad faith by state

agencies or officers, the proper remedy is the bidder's lost

profits. See Bradford & Bigelow, Inc. v. Commonwealth, 24 Mass.

App. Ct. 349, 359 (1987).  These principles follow from the

state's interest in encouraging bidders and promoting public

confidence in the competitive bidding system. Id.

    Massachusetts courts have found similar implied rights in

other contexts, including in a case that found

> the clean elections law is similar to other statutes
> under which we have found the Commonwealth liable for
> payment to a third party where that third party, to
> its own detriment, has fully complied with the
> statutory requirements – and the State has
> acknowledged or approved the compliance – such as to
> confer a direct benefit to the State pursuant to a
> statutory scheme promising payment for the benefit.

Bates v. Dir. of Office of Campaign and Political Fin., 436

Mass. 144, 169-70 (2002).  In other words, Massachusetts courts

have consistently found remediable the Commonwealth's violations

of its own statutory schemes when they are relied upon by private parties.

Here, while Caesars did not itself submit a casino license application, the statutory scheme provides that the requirement to be investigated for "suitability" applies to

> all persons who have a professional interest in a gaming license, or gaming vendor license, or the business of a gaming licensee or gaming vendor.

M.G.L. c. 23K, §2.  Thus, Caesars undoubtedly relied on the statutory scheme governing casino licenses, even if indirectly.

Therefore, while a qualifier is not in direct contractual privity with the Gaming Commission in the same manner as an applicant, recognizing that the property right at issue also applies to qualifiers furthers the "paramount policy objective" of the governing statute which is to "ensur[e] public confidence in the integrity of the gaming licensing process." Id. § 1. Accordingly, the Court finds that Caesars has a legitimate claim to a property right in the Gaming Commission's consideration of SSR's casino license application.

### ii.  Identity of the Depriver

To state a valid claim for violation of procedural due process, plaintiff must also allege that defendants deprived it of constitutionally adequate process while acting under color of state law. Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011).  In other words, defendants themselves must have

-27-

deprived plaintiffs of whatever property interest they had. While the actions of a private party will not suffice ordinarily, in certain cases private actors can exercise "coercive power" or provide "significant encouragement" such that the "choice must in law be deemed to be that of the State." See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50-52 (1999).

The parties again line up on opposite sides. Caesars argues that defendants forced its withdrawal by executing a biased suitability investigation and by denying SSR and it adequate time to prepare for a hearing. Defendants retort that Caesars alleges only that SSR asked it to withdraw and that it agreed, belying any claim that defendants can be made liable for causing any injury to plaintiff's property right.

It is undisputed in this case that the impetus for Caesars' purported harm came from SSR which asked Caesars to withdraw. If undertaken independently, that action would constitute simple private conduct not actionable under § 1983. Indeed, even "passive acquiescence in, or mere approval of" SSR's actions by defendants is insufficient to constitute a violation of plaintiff's constitutional rights. See Perkins v. Londonderry Basketball Club, 196 F.3d 13, 21 (1st Cir. 1999). If, however, defendants strong-armed SSR to drop Caesars, then a cause of action under § 1983 is viable. See Sullivan, 526 U.S. at 50.

Here, Caesars alleges facts regarding defendants' level of involvement with SSR, procedural irregularities in their consideration of SSR's application and plausible biases of Crosby.  After consideration of the Third Amended Complaint and, as it must at this juncture, drawing all reasonable inferences in plaintiffs' favor, the Court finds sufficient allegations, if believed, to establish indirect state action. See Richards v. City of Lowell, 472 F. Supp. 2d 51, 74-75 (D. Mass. 2007) (finding sufficient to show a nexus with a state actor evidence that defendant "had a high level of involvement" with the action at issue and "a great deal of influence" over the individual who took the direct action).

The parties dispute the applicability to this case of Sullivan v. State of N.J., Div. of Gaming Enforcement, 602 F. Supp. 1216 (D.N.J. 1985).  While Sullivan addressed strikingly similar circumstances to those of this case, namely a due process claim alleging that state gaming authority officials had interfered with the plaintiff's business dealings with a casino license applicant, it gave short shrift to the applicability of the "state compulsion test" outlined in Perkins and other cases in the First Circuit.  Indeed, the dictum in the Sullivan case that even an order of state officers to a third party to cease all dealings with the plaintiff as a prerequisite to obtaining a casino license would not rise to the level of indirect state

-29-

action, id. at 1221 (emphasis added), is contradicted by First Circuit precedent. See Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 5 (1st Cir. 2005) (noting that a private party can be "fairly characterized as a state actor when the state has exercised coercive power or has provided...significant encouragement"). Accordingly, the relevance of the Sullivan decision to this case is minimal at best and it does not alter this Court's contrary conclusion.

### iii. Adequate Process

The final element of a procedural due process claim is the deprivation of a property interest without constitutionally adequate process. Garcia-Rubiera v. Fortuño, 665 F.3d 261, 270 (1st Cir. 2011). Procedural due process, at a minimum, requires that

> the affected individual must be forewarned and afforded an opportunity to be heard "at a meaningful time and in a meaningful manner."

Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

In this case, Caesars contends that defendants forced it to withdraw and then denied it the "mandated minimum" 30-day period in which to prepare for the suitability hearing. In the alternative, it emphasizes that participation in the suitability hearing would have been futile because of defendants' clear and stated intention to reject Caesars' entreaties. Defendants

-30-

respond that Caesars failed to avail itself of the proper
procedures through which it could have challenged the Gaming
Commission's adverse determination.  Moreover, they note that
Caesars was not entitled to 30 days to prepare for any
proceeding because it was a qualifier, not an applicant.

Based on the allegations contained within the Third Amended
Complaint, the Court finds that plaintiff has pled sufficient
facts that, when assumed to be true, constitute a deprivation of
a property interest without due process.  Crediting plaintiff's
plausible allegations, as it must, the Court finds that
plaintiff need not have fully pressed its procedural rights in
the face of futility. See Collier v. Town of Harvard, 1997 WL
33781338 (D. Mass. Mar. 28, 1997).  Therefore, the Court finds
that plaintiff has stated a claim that defendants violated its
constitutional right to procedural due process.

### b.   Substantive Due Process

To state a valid claim for a violation of substantive due
process, a plaintiff must allege that defendants' actions
deprived him of a protected interest in property and that the
actions were "so egregious as to shock the conscience."
Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 639 (1st Cir.
2013).  To shock the conscience, a defendant's conduct must be
"truly outrageous, uncivilized, and intolerable." Hasenfus v.

LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999).  Of particular

relevance to this case, the First Circuit has held that

> any permit or license denial, no matter how
> unattractive, that falls short of being truly
> horrendous is unlikely to qualify as conscience-
> shocking.

Pagan v. Calderon, 448 F.3d 16, 33 (1st Cir. 2006) (internal

quotation marks and citation omitted).

Here, even accepting Caesars' well-pled facts and drawing

reasonable inferences in its favor, the Court finds no conduct

that is shocking, uncivilized or truly horrendous.  Because

substantive due process may not ordinarily be invoked to

challenge "discretionary permitting or licensing determinations

of state or local decisionmakers," id. at 33, plaintiff's

substantive due process claim fails.

### c.   Equal Protection

Caesars' final substantive claim is that defendants'

conduct violated the constitutional guarantee of equal

protection.  To state a "class-of-one" equal protection claim,

plaintiff must plausibly allege that it has been

> intentionally treated differently from others
> similarly situated, that no rational basis exists for
> that difference in treatment, and that the different
> treatment was based on malicious or bad faith intent
> to injure.

Buchanan v. Maine, 469 F.3d 158, 178 (1st Cir. 2006).  Entities

are "similarly situated" when the plaintiff has "engaged in the

same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances" as would render any comparison pointless. <u>Cordi-Allen</u> v. <u>Conlon</u>, 494 F.3d 245, 251 (1st Cir. 2007).

Caeasars argues that defendants treated it differently from other applicants and qualifiers by singling it out for extra scrutiny, creating pretextual reasoning for their decision, shifting their reasoning to avoid challenge and denying Caesars procedural rights to defend itself.  In essence, however, Caesars' argument is that defendants gave preferable treatment to Wynn.

Defendants respond that class-of-one claims are not viable when a plaintiff contests "discretionary authority based on subjective, individualized determinations," <u>Engquist</u> v. <u>Or. Dep't of Agric.</u>, 553 U.S. 591, 602 (2008), or when the proposed comparators are not similarly situated.  Therefore, according to defendants, to the extent Caesars was treated differently, such differences are due to the "idiosyncrasies" of each applicant and qualifier's structure and history.

Defendants have significant discretionary authority in the casino license application selection process but the Court need not address that argument because the differences between plaintiff and Wynn are sufficient to imperil their equal

protection claim.  The Court points out a few of these differences.

> Notably, Caesars argument is circular.  It asserts that

> the results of the investigations differed does not prove that the applicants were differently situated; rather, it proves that they were improperly subjected to different levels of scrutiny.

That argument assumes, without analytical pause, that the <u>only</u> way the various prospective casino operators could have been found distinctive is if they were evaluated under different, namely discriminatory, rubrics.  Plaintiff, again, tries to prove too much.

Most prominently, Caesars dwells on the purported linkage between Wynn and the rampant gaming-related corruption in Macau, criticizing the Gaming Commission for not focusing on that connection while fixating on plaintiff's connection with an owner of the Gansevoort hotel company.  Caesars suggests that both it and Wynn are surrounded by rumors of links to organized crime but only its reputation became an issue in the IEB's suitability investigation.  The difference, however, between the rumored connections of both entities with organized crime affects their similarity, not the defendants' treatment of each. Other factors are susceptible of a similar analysis. Ultimately, Caesars cannot plead a viable equal protection claim

because there are rational reasons for differentiating between it and Wynn.

### 2.   Clearly Established

Because the Court has determined that Crosby's actions violated plaintiff's right to procedural due process, the Court now must decide whether the right Crosby infringed was clearly established.  The Court answers that question in the negative because it finds that, although the extension of Massachusetts contract law principles is logical, it is also novel. Accordingly, the Court will allow defendants' motion to dismiss Caesars' procedural due process claim against Crosby in his official capacity as barred under the doctrine of qualified immunity.

Massachusetts law is clear that the integrity of its public bidding laws is supported by an implied contractual right to due process in the consideration of a bid. See Paul Sardella Constr., 3 Mass. App. Ct. at 333.  That principle extends to circumstances beyond public bidding for state contracts. See Bates, 436 Mass. at 169-170.  In this case, defendants concede that that principle applies to casino license applicants.  The Court finds those areas of law to be "clearly established." See Maldonado, 568 F.3d at 269.

As previously elucidated, the Court also finds ample support to extend that same implied contractual right to

qualifiers in the casino license application process.  Their
participation is critical to any large-scale development, such
as a resort casino, and, just as applicants, qualifiers expend
resources in reliance on state contract selection procedures.
The state's interest in encouraging bidders and promoting public
confidence in the integrity and fairness of the competitive
bidding system is enhanced by extending an implied contractual
right to qualifiers.

At the same time, however, the Court acknowledges that
extending an implied contractual right to qualifiers is, in
fact, an extension.  It cannot, therefore, be said to be
"clearly established" and, accordingly, defendants are entitled
to the protection of qualified immunity despite the violation of
plaintiff's rights pled in the Third Amended Complaint.

Moreover, even if that extension of the law were clearly
established, the Court concludes that from a constitutional
perspective, defendants' actions represent the epitome of a
"close call" warranting application of the doctrine of qualified
immunity. See Machado v. Weare Police Dep't, 494 Fed. App'x 102,
105 (1st Cir. 2012) (noting that even if a police officer
"judged wrong," "it was a close call and he is plainly protected
by qualified immunity").

Of course, it would be clearly unconstitutional for a state
actor to engage in a deceitful and purposeful conspiracy to

deprive an applicant (or a qualifier) for a state-provided business license of the opportunity to compete for that license. That is especially true if the purpose of the state actor was to favor a former business partner based upon pretextual characterizations of a qualifier's actions.  Such actions would shock the conscience as "truly outrageous" and thus constitute a violation of substantive due process.  Caesars can only reach that negative conclusion, however, by assuming a series of improbable inferences, themselves resting on the shaky foundation of a number of "naked assertions." See Soto-Torres, 654 F.3d at 156.  Stripped of its sensational accusations of Crosby's nefarious motive, assertions the Court does not assume to be true at this juncture, plaintiff has simply alleged a violation of procedural due process that the Court considers a close call.  Courts must accept well-pled facts as true but need not indulge in improbable conspiracy theories.

## IV.  **Tortious Interference**

Caesars' final claim is for tortious interference under Massachusetts state law against Crosby in his individual capacity.  The Court takes no view of the merits of that claim because it declines to exercise supplemental jurisdiction over the sole remaining state law claim. See Marek v. Rhode Island, 702 F.3d 650, 652 (1st Cir. 2012).

-37-

**ORDER**

For the foregoing reasons,

1)    plaintiff's motion for leave to file a Third Amended
      Complaint (Docket No. 60) is **ALLOWED**;

2)    defendants' motion to dismiss (Docket No. 15) is
      **ALLOWED**;

3)    defendants' motion to extend the deadline for
      automatic discovery (Docket No. 61) is **DENIED as moot**;
      and

4)    the case is **DISMISSED**.


**So ordered.**


                                    /s/ Nathaniel M. Gorton_____
                                    Nathaniel M. Gorton
                                    United States District Judge
Dated May 30, 2014