|  |  |  |
|---|---|---|
| CAESARS MASSACHUSETTS MANAGEMENT COMPANY, LLC, a Delaware limited liability company, CAESARS MASSACHUSETTS DEVELOPMENT COMPANY, LLC, a Delaware limited liability company, CAESARS MASSACHUSETTS INVESTMENT COMPANY, LLC, a Delaware limited liability company, and CAESARS ENTERTAINMENT CORPORATION, a Delaware corporation, | ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 1:13-cv-13144-NMG |
| Plaintiffs, | ) ) | (Leave to file granted on 5/30/2014) |
| v. | ) ) | |
| STEPHEN P. CROSBY, *in his personal capacity and in his official capacity as Chairman of the Massachusetts Gaming Commission,* and KAREN WELLS, *in her personal capacity and in her official capacity as Director of the Investigations and Enforcement Bureau of the Massachusetts Gaming Commission,* | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## THIRD AMENDED COMPLAINT

This is an action by Caesars Massachusetts Management Company, LLC, Caesars Massachusetts Development Company, LLC, Caesars Massachusetts Investment Company, LLC and Caesars Entertainment Corporation ("Caesars")(collectively "Plaintiffs"), pursuant to 42 U.S.C. § 1983 ("§ 1983"), against Stephen P. Crosby ("Crosby") in his individual capacity and in his official capacity as Chairman of the Massachusetts Gaming Commission (the "Commission") for violation of Plaintiffs' due process and equal protection rights as guaranteed by the Fifth and

Fourteenth Amendments of the Constitution of the United States of America and enforced pursuant to 42 U.S.C. § 1983. Crosby is also sued in his individual capacity for tortious interference with Plaintiffs' contractual and advantageous relationship with Sterling Suffolk Racecourse, LLC and with Plaintiffs' contractual rights to fair consideration in the Massachusetts gaming license application process. This is also an action against Karen Wells ("Wells"), for declaratory and injunctive relief only, in her individual capacity and in her official capacity as Director of the Investigation and Enforcement Bureau (the "Bureau"), an arm of the Commission, for violation of Plaintiffs' due process and equal protection rights as guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States of America and enforced pursuant to 42 U.S.C. § 1983.

Plaintiffs have filed this action challenging the constitutionality, objectivity and fairness of the treatment of Plaintiffs by Crosby, individually and as Chairman of the Commission, due to, among other things, Crosby's conflicts of interest and his failure to timely disclose them until forced to do so because of a related criminal investigation. Based in part upon statements made by Crosby and by the Commission on the day after the filing of the original Complaint, and in part upon her own conduct in the investigative process relating to Plaintiffs and to others, Plaintiffs further challenge the constitutionality, objectivity and fairness of the treatment of Plaintiffs by Wells, individually and as Director of the Bureau. Plaintiffs do not seek monetary damages from Wells.

As set forth below, Crosby's conduct was and is arbitrary and capricious and shocks the conscience.

## Venue and Jurisdiction

1.     Plaintiffs Caesars Massachusetts Management Company, LLC, Caesars Massachusetts Development Company, LLC, and Caesars Massachusetts Investment Company, LLC are Delaware limited liability companies with their principal places of business at One Caesars Palace Drive, Las Vegas, Nevada.  Plaintiff Caesars is a Delaware corporation with its principal place of business at One Caesars Palace Drive, Las Vegas, Nevada.  With the exception of Caesars, Plaintiffs were established (at the direction of Caesars) for the purpose of participating in an application for the sole gaming license permitted pursuant to M.G.L. c. 23K in the Greater Boston area, and for the purpose of participating in various aspects of the gaming operations if the license were granted.  Caesars is the direct or indirect owner of Plaintiffs, and of special purpose entities in most venues in which Caesars' affiliates operate.  Caesars was the qualifier as to whom the Bureau recommended a finding of unsuitability as described below.

2.     Defendant Crosby is a Massachusetts resident with his principal place of business in Boston, Massachusetts.  Crosby is, and has been since 2011, Chairman of the Commission.  His actions as alleged in the § 1983 counts of this Third Amended Complaint were taken under color of state law.  He is also sued in his individual capacity.

3.     Defendant Wells is a Massachusetts resident with her principal place of business in Boston, Massachusetts.  Wells is, and at all times material hereto has been, Director of the Bureau, an arm of the Commission.  Her actions as alleged in the § 1983 counts of this Third Amended Complaint were taken under color of state law.  She is also sued in her individual capacity.  No damages are sought against Wells.

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367 and 2201 and 42 U.S.C. § 1983 and personal jurisdiction over Defendants Crosby and Wells because each of them resides in Massachusetts.

5.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b), because the events giving rise to these claims occurred here.

## Factual Allegations Applicable to All Counts

6.     The Commission is an agency of the Commonwealth of Massachusetts established in 2011 by the Massachusetts Expanded Gaming Act (the "Gaming Act").  *See* Ch. 194, Acts of 2011 (Mass.), *codified at* M.G.L. c. 23K.   The declared mission of the Commission is "to create a fair, transparent, and participatory process for implementing the expanded gaming law."  The Commission's place of business is in Boston, Massachusetts.

7.     The tasks of the Bureau include conducting investigations into the suitability of applicants for gaming licenses, and making recommendations thereon to the Commission ("Suitability Determinations"). M.G.L. c. 23K § 6.

8.     In her capacity as Director of the Bureau, Wells reports to Crosby, who determines the functions of the Bureau.  Crosby, who was appointed in late 2011, and Wells, who was appointed in early 2013, are the first persons to hold their respective positions.  On information and belief, Crosby was the decision-maker, or one of the decision-makers, in the selection of Wells for her position.  Although Crosby belatedly recused himself on May 8, 2014 from the Region A category 1 gaming license process described herein, he continues as of the date of this filing to serve in the role of Chairman of the Commission with supervisory authority over the employees of the Commission and with statutory supervision and control over all the affairs of the Commission.

9.     Caesars and certain of its affiliates are operators of casinos and other gaming establishments.   Caesars, by itself and through its affiliates, is licensed to operate gaming facilities in more jurisdictions, both in the United States and abroad, than any other gaming

-4-

company.  In its 75 years of operation, Caesars has built a reputation for world-class facilities management and regulatory compliance.

10.     The Gaming Act, codified at M.G.L. c. 23K, establishes a process for issuing licenses (denoted "category 1 licenses") for up to three casinos in Massachusetts, one in each of three geographic regions.  The region principally relevant to this action, Region A, includes Suffolk, Middlesex, Essex, Norfolk and Worcester Counties.  The Gaming Act licensing process is administered by the Commission; and Crosby as Commission Chair oversaw the Region A licensing process until his belated recusal from that process on May 8, 2014.

11.     In 2011, Caesars was asked to invest in, and acting through one or more affiliates as the casino and hotel manager for, Sterling Suffolk Racecourse, LLC ("SSR"), an entity that had already been formed and which intended to apply for a category 1 license in Region A.  The members in SSR include persons and entities related to the Suffolk Downs racecourse located in East Boston and Revere, where SSR originally intended to build and operate a casino if it were awarded a category 1 license.  Before submitting a full license application, SSR was required by the Gaming Act to undergo an investigation as part of its Suitability Determination.  This process includes a determination of suitability not only as to the named applicant, but also as to various other individuals and entities involved in a casino project.  A Suitability Determination is a prerequisite to proceeding with submission of a full application.

12.     The Gaming Act was passed into law on November 22, 2011.   Pursuant to M.G.L. c. 23K § 3(a), the Gaming Act codifies extensive procedures for the licensing and regulation of gaming by the Commission. The Commission consists of five (5) Commissioners and is headed by a chairman, Crosby as of the date of this filing.  Under the Gaming Act, the Chairman has "supervision and control over all the affairs of the commission."  *Id*.

13.     The Gaming Act establishes "within" the Commission the Bureau, "which shall be the primary enforcement agent for regulatory matters" under the Gaming Act.  M.G.L. c. 23K § 6(a).  The Bureau "perform[s] such functions as the chair [of the Commission] may determine in relation to enforcement, including the investigation of all licensees under this chapter." *Id.*

14.     As Director of the Bureau, Wells exercises and discharges her official duties "subject to the direction, control and supervision of the chair" of the Commission, to wit, Crosby. M.G.L. c. 23K § 6(a).

15.     The Gaming Act requires that "[t]he commissioners and those employees holding major policymaking positions shall be sworn to the faithful performance of their official duties." M.G.L. c. 23K § 3(u).  More specifically, such individuals are required to

> (i) conduct themselves in a manner so as to render decisions that are fair and impartial and in the public interest; (ii) avoid impropriety and the appearance of impropriety in all matters under their jurisdiction; (iii) avoid all prohibited communications; (iv) require staff and personnel subject to their direction and control to observe the same standards of fidelity and diligence; (v) disqualify themselves from proceedings in which their impartiality might reasonably be questioned; and (vi) refrain from financial or business dealings which would tend to reflect adversely on impartiality.

*Id.*

The Commission has also adopted an Enhanced Code of Ethics which "establishes ethics rules for Commissioners, employees and consultants of the [Gaming Commission] that are more restrictive than those already applicable to all state employees …." Gaming Commission, Enhanced Code of Ethics, ¶ 1. (Feb. 21, 2013).  The Enhanced Code of Ethics states that "No Commissioner … may participate in a particular matter … pending before the Commission that may affect the financial interest of … a person with whom they have a significant relationship," *Id.* ¶ 9(A), and that, "Commissioners must recuse themselves from any licensing decision in which a potential conflict of interest exists."  *Id.* ¶ 9(C).

16.     Plaintiffs participated in the SSR joint venture in a variety of roles.  Among other things, until Plaintiffs' withdrawal from SSR is completed, one of Plaintiffs is a member of the main SSR entity, and until the occurrence of the events described herein, certain of Plaintiffs provided funding, development services, and expected to serve as the gaming facilities manager upon completion of the project.

17.     In connection with Plaintiffs' agreements with SSR, Plaintiffs have invested over $100 million dollars in both common and preferred equity.  Tens of millions of that amount has been spent on development costs, including plans, architectural designs and costs, including fees and investigative costs, in connection with SSR's pursuit of a category 1 license.  Even before the formal submission of SSR's application in early 2013, Crosby demonstrated a predisposition against the SSR proposal.  Upon information and belief, this predisposition against the Suffolk Downs/SSR proposal was, in whole or in part, a product of Crosby's predisposition in favor of the Everett proposal for which the Suffolk Downs proposal was the major, and eventually the sole, competition.  For example, in or about August of 2012, Crosby became aware that property in Everett that was being marketed by its owners as a potential casino site was partially owned by his friend and former business partner (the "Everett Site").  At or about the same time, i.e., August of 2012, Crosby suggested to an internationally known casino operator interested in a license in Western Massachusetts that it consider the Boston area (which includes Everett) as a site for its potential casino.  This unsolicited suggestion was to the potential detriment of Springfield, the community under consideration by that operator, and to the more certain detriment of the operator's development partner, Western Mass Development.  Crosby's unsolicited suggestion was potentially to the substantial advantage of his friend and former business partner who owned an interest in the Everett Site.  Crosby professed that the reason for

his suggestion was to generate more competition for the SSR/Suffolk Downs proposal, although the generation of competition was not within the purview of his responsibilities as Chair of the Commission.

18.  In or about August or September of 2012, a prospective operator headed by Las Vegas and Macau operator Stephen Wynn ("Mr. Wynn") that had been focused upon developing a casino in Foxborough turned its attention to the Everett Site, although it did not formally withdraw from the Foxborough effort for another several months.

19.  On January 15, 2013, SSR submitted its initial application for a category 1 license to the Commission, with Plaintiff Caesars Massachusetts Management Company, LLC identified as the casino operator.  All or a significant portion of the funds for the $400,000 filing fee were provided by Caesars through its investment in SSR.

20.  Within three months of SSR's submission, Mr. Wynn's company, which was formerly involved in the Foxborough project, announced its plans to pursue a casino project in Everett, Massachusetts (the "Everett Applicant") and withdrew its efforts to participate in a casino project in Foxborough.  The Everett Site, which the Everett Applicant optioned to purchase if it won the Region A license at a reported price of seventy million dollars ($70,000,000), was the location of a former manufacturing facility.  The Everett Site is contaminated and had been deemed of limited development value for many years.

21.  Unbeknownst to Plaintiffs at the time they submitted materials to the Commission as part of SSR's licensing application and throughout the SSR suitability investigation process, Crosby had a publicly undisclosed conflict of interest in contravention of the Gaming Act's requirements that commissioners must "avoid impropriety and the appearance of impropriety in all matters under their jurisdiction… [and] disqualify themselves from proceedings in which their

impartiality might reasonably be questioned," M.G.L. c. 23K, § 3(u); and in contravention of the requirement imposed by the Enhanced Code of Ethics that "Commissioners must recuse themselves from any licensing decision in which a potential conflict of interest exists." Indeed, Crosby himself has publicly stated the importance of "appearances and impressions" in the licensing application process. As recently as May 8, 2014 when he belatedly recused himself from the Region A licensing process, he issued a statement to the effect that, "I have said repeatedly over my 2 years as Chair of the Gaming Commission that the single highest priority for our work is that we protect the integrity of the decision making process. And I have also said repeatedly that the appearance of integrity as well as the reality of integrity is critical." Yet, Crosby's conflict would, on its face, predispose Crosby to favoring a rival to SSR's application for the category 1 license in Region A; but, he did not recuse himself until Plaintiffs were already coerced and forced out of the process.

22. Specifically, Crosby failed to disclose publicly his past business and personal relationships with Paul Lohnes ("Lohnes"). With an ownership interest of approximately 50%, Lohnes was and is the largest stakeholder in the Everett Site. Lohnes stood, and still stands, to benefit significantly if the Everett Applicant's application for that license is granted and the option thereby exercised. According to press reports, this land was originally purchased in 2009 for $8 million and the option purchase designated for this land was to be $70 million (reduced to $35 million because of the identity of an alleged secret investor as described below), contingent upon the awarding of a casino license to the Everett Applicant for the Everett Site.

23. Crosby and Lohnes have known each other since they served in the National Guard together in the 1970s and have socialized together since that time. In approximately 1983,

Crosby solicited Lohnes to invest in his business. Lohnes did so, becoming the treasurer of the business and Crosby's business partner from 1983 to 1990.

24. According to another participant in the same business, as reported in *The Boston Globe* and alleged here upon information and belief in reliance thereon, Crosby's business, which became the Crosby Vandenburgh Group, was struggling financially when Lohnes infused funds into the entity, became the entity's treasurer, and reportedly saved the entity (and probably Crosby) from a financial downfall. Crosby has not disclosed the structure of Lohnes' participation in that entity, e.g., loan, common stock, preferred stock, options, warrants, etc., contending that the records have been lost. Crosby also has not disclosed Lohnes' return on his investment, loan, or compensation from the entity, or the structure of his own participation in that entity, e.g., guarantor of its debt, etc., either before or after Lohnes' participation in that entity, or the extent to which he benefitted financially, if at all, from the turn-around of that entity. Within three years of Lohnes' participation and infusion of funds, revenue had grown fourteen-fold, leading to a sale of the business in 1990. However, according to a report issued by the Bureau, Lohnes apparently did not recoup his funds, nor was he entitled to any recoupment according to the terms of the transaction, the documentation for which is reportedly lost. Crosby's indebtedness to Lohnes was therefore reportedly never satisfied.

25. Although Crosby was aware by the latter part of 2012 of Lohnes' ownership interest in the Everett Site, at or about the same time that the Everett Applicant began consideration of the Everett Site for its potential casino, Crosby did not disclose his past business or personal relationship with Lohnes at that time. Crosby has stated that he reasoned that, since he had not seen Lohnes in months and had no plans to see him in the near future, it was not necessary to file any disclosures with the State Ethics Commission.

26.     Whether in connection with the Foxborough effort or with the Everett Site, at some point the Everett Applicant retained the services of a highly regarded government relations firm in the City of Boston.  Upon information and belief, members of that firm, and others retained by them, or by the Everett Applicant at their recommendation, had personal or former professional relationships with Crosby, Wells, the State Police, and others working within the Bureau that allowed the Everett Applicant readier access to Crosby and to the Bureau's investigative process than Plaintiffs enjoyed.   While the government relations firm was merely performing its job, neither Crosby nor Wells disclosed either the relationships or the comparative level of access to, *inter alia*, Plaintiffs and the public.

27.     On August 9, 2013, Crosby and others at the Commission, on information and belief including Wells, received an "executive briefing" from undisclosed individuals relating to issues pertaining to ownership of the Everett Site.  On information and belief, this briefing related to, or was triggered by, an ongoing criminal investigation into whether the record owners of the Everett Site, including Lohnes, had hidden the participation of at least one secret investor/owner who was a convicted felon, to wit: Charles Lightbody ("Lightbody").   Crosby advised those present of his relationship with Lohnes and left the briefing.  However, he still did not report the relationship to the State Ethics Commission.

28.     At or about that time, the Bureau undertook an investigation into the ownership issues regarding the Everett Site as part of its suitability review of Wynn Resorts, whose casino would be built upon the Everett Site if Wynn Resorts were granted the Region A license.  On August 21, 2013, apparently in connection with the Bureau investigation, Crosby was interviewed by a Massachusetts State Police officer whose identity has been withheld.  Crosby informed the interviewer of his relationship with Lohnes.

29. On August 22, 2013, Crosby privately disclosed his relationship with Lohnes to the Governor's office for the first time, but asserted that he could "perform [his] official duties objectively and fairly." He still did not report the relationship to the State Ethics Commission, and he continued to withhold public disclosure regarding his relationships with Lohnes.

30. Crosby did not report the Lohnes relationship to the Ethics Commission until October 22, 2013, *the first business day* after Plaintiffs were compelled to withdraw from the licensing process as more fully alleged below.

31. Despite being bound by the Commission's Enhanced Code of Ethics, and despite his statements regarding the importance of "appearances and impressions" in the licensing application process, Crosby had engaged, and continued to engage at least through May 8, 2014, in conduct that benefitted, or at very least appeared to benefit, the Everett Applicant.

32. Examples of such conduct include, without necessary limitation, the following:

a. When Mr. Wynn, the principal of Everett Applicant Wynn Resorts, learned that the Commission intended to require that suitability determinations be made in advance of host community referenda, he called Crosby directly to protest that such a requirement was not appropriate for the Everett Site because of its harborside location and purported requirements attendant upon waterfront sites. Crosby responded by thanking Mr. Wynn and permitting the referendum respecting the Everett Site to proceed without the suitability determination (although a similar chronological accommodation was denied to Plaintiffs as alleged below).

b. According to various print and television news reports and asserted here upon information and belief, in early September 2013, Crosby stepped in to resolve a

conflict between the City of Boston ("Boston") and the Everett Applicant, and in doing so cleared a potential obstacle for the Everett Applicant in its licensing process. The City argued that the Everett Applicant's proposed site in Everett extended into Boston, and thus Boston should be considered a host community under the regulations. Having Boston as a home community would have required the Everett Applicant to negotiate an agreement with Boston regarding finances and impact mitigation as it had with Everett, a daunting task because of the support of Boston's then Mayor for the Suffolk Downs/SSR project. However, Crosby suggested that the Commission would intervene if Boston and the Everett Applicant could not come to an agreement promptly. On September 6, 2013, Crosby announced that Boston would be a "surrounding community" rather than a "host community", thereby resolving the controversy in favor of the Everett Applicant. When the successor Mayor requested that the Commission consider the issue of host community status for the City of Boston, Crosby recused himself at the beginning of the hearing after apparently participating in preceding deliberations of the topic. The Commission issued a finding adverse to the City approximately ten minutes after the hearing of three hours duration, leading to public suggestions  by the City that the decision was determined before the hearing, and therefore before Crosby's recusal.

c.  On or about October 17, 2013, one day before Wells signed and issued the Bureau's unfavorable suitability recommendation pertaining to Plaintiffs, the Commission conducted a hearing relating to certain applicants' operations abroad, particularly in Macau. Macau is, and has for some time been, a gaming venue of

-13-

significant concern to United States authorities in relation to U.S. licensed gaming operators which also do business there. An area of significant concern relates to relationships between U.S. gaming operators' affiliates and one or more Asian organizations considered to be criminal enterprises involved in so-called junkets and VIP rooms. The Everett Applicant and at least one other applicant were invited to participate in the Commission's hearing. Plaintiffs were not invited to participate, apparently because neither they nor any of their affiliates has gaming operations in Macau. At the hearing, Mr. Wynn expressed displeasure with the Commission's approach and attitude toward gaming in Macau, based upon a perception that the Commission was applying a materially different standard than that applied by other gaming commissions in the United States when addressing gaming operations conducted abroad pursuant to foreign gaming laws. After the hearing, as presaged in comments made by Mr. Wynn at the hearing ("We're scared to death, Chairman. We're scared to death that—not that [you] won't pick us, that you will and there goes a billion three or a billion five"), Mr. Wynn contemplated whether his entity should withdraw from participation in the application process in Massachusetts. According to information subsequently conveyed by Mr. Wynn in a published interview, and in a conversation with Caesars CEO and Chairman Gary Loveman ("Loveman"), upon learning of Mr. Wynn's intention to withdraw, notwithstanding the on-going concerns of U.S. authorities regarding Macau operations, and notwithstanding his statutory role as the unbiased overseer of the Massachusetts gaming license application process, Crosby, in the company of another Commissioner, took it upon himself to place

or return a call to Mr. Wynn and to encourage Mr. Wynn to remain in the Massachusetts licensing process.

d. On or about November 22, 2013, shortly after *The Boston Globe* reported that a federal investigation was underway with regard to the ownership of the Everett Site and a suspected hidden investor, Crosby came to the 's defense of Wynn Resorts, suggesting that the problem was unknown to, and had nothing to do with, Wynn Resorts.

33. Because of Crosby's personal and business relationships with Lohnes, who stands to gain a significant financial benefit should the Everett Applicant's application be approved and a category 1 license granted to it, Crosby was and prior to his belated recusal remained conflicted as to consideration of all applications for a category 1 license in Region A.

34. On May 8, 2014, after Plaintiffs had been forced out of the licensing process as alleged herein, Crosby announced that he was recusing himself "from any further involvement in any of the issues concerning the licensing decision for Region A," because his "participation in the decision making process has become a distraction and a potential threat to [the Commission's] appearance of total impartiality."

35. The Attorney General and the Treasurer of the Commonwealth, in addition to the Governor, each appointed one member of the Commission, and together with the Governor collectively appointed the other two members. On May 9, 2014, the Attorney General and the Treasurer, as well as three other gubernatorial candidates, called for Crosby's resignation from the Commission. Should such resignation occur, Plaintiffs contend that it will further buttress the allegations contained herein.

36.     Crosby was conflicted during all times that the suitability of SSR, Plaintiffs and the Everett Applicant were under investigation by the Bureau.

37.     Wells, as director of the Bureau, reports directly to Crosby, is subject to his jurisdiction, and, moreover, exercises and discharges her official duties "subject to the direction, control and supervision" of Crosby. M.G.L. c. 23K § 6(a). Upon information and belief, Wells consulted with, and was influenced by, Crosby with regard to the Region A investigations described hereinbefore she issued the suitability reports, including with regard to SSR, the Everett Applicant, and the Springfield Applicant.

38.     The Commission held and continues to hold multiple hearings over which Crosby presides, and during which Wells testifies regarding the Bureau's investigations and recommendations. On information and belief, because of their official positions and the locations of their offices, Crosby and Wells regularly and frequently converse about Commission proceedings outside the context of public hearings and Commission meetings.

39.     To fulfill his duties under the Gaming Act and other law and regulation, Crosby was obliged to inform, *inter alia*, Wells of all of his actual or apparent conflicts with regard to, *inter alia*, the Region A licensing process.

40.     As the Commission's chief enforcement officer, and as the official responsible for making suitability recommendations to Crosby and the Commission, Wells either knew, or Crosby should have advised Wells, of his conflicts.

41.     Pursuant to its governing regulations, the Bureau retained Spectrum Gaming Group LLC ("Spectrum") to conduct an investigation into the suitability of SSR and its qualifiers, including Plaintiffs, under the Gaming Act. Spectrum led the investigation into SSR's suitability in conjunction with the Massachusetts State Police and the Bureau. Spectrum is

known for its stringent standards in reviewing applicants in the suitability process, and in particular with regard to U.S. gaming operators whose affiliates engage in gaming operations in Macau.  Upon information and belief, the applicant for a license in Springfield (the "Springfield Applicant") and the Everett Applicant, each of which has an affiliate engaged in gaming operations in Macau, requested that Spectrum be disqualified from their evaluations, albeit on grounds unrelated to Macau.  Plaintiffs, who do not have a Macau gaming affiliate, did not request disqualification of Spectrum as their investigator.  The request of the Springfield Applicant was denied, while that of the Everett Applicant was granted.  A different investigative group was used for the suitability review of the Everett Applicant.

42.     In or around April 2013, Spectrum, as is customary in the licensing application process, interviewed various employees of Caesars and certain of its affiliates as well as members of Caesars' wholly-independent Compliance Committee, about various matters, including Caesars' compliance process and background investigation respecting a trademark licensing agreement entered into in the previous month between an affiliate of Caesars and Las Vegas Gansevoort, LLC, a subsidiary of Gansevoort Hotel Group ("Gansevoort").   The Gansevoort trademark licensing agreement granted another affiliate of Caesars the right to use the "Gansevoort" name in connection with hotel and other non-gaming operations of a property in Las Vegas in return for a license fee.  The license fee was based solely on hotel revenue. Gaming revenue was not included. Gansevoort was to have no input in the operation or management of the hotel, other than to advise and specify quality and service levels to be maintained per its brand standards.  Spectrum had questions about one of the principals of Gansevoort (the "Gansevoort Principal"), in connection with unsubstantiated reports that the Gansevoort Principal, who moved to the United States from Russia as a boy, allegedly had ties to

Russian organized crime (the "Gansevoort Issue"). In no way did Spectrum or the Bureau lead Plaintiffs to believe that the Gansevoort Issue, which was so attenuated and so much less serious than relationship concerns for the applicants with Macau affiliates, was an impediment to a finding of suitability.

43.     On May 31, 2013, Timothy R. Donovan, Executive Vice President, General Counsel and Chief Regulatory & Compliance Officer of Caesars ("Donovan"), wrote to Fred Gushin ("Gushin"), a Managing Director of Spectrum, to explain the due diligence and compliance investigations that had been performed prior to entering the Gansevoort trademark licensing agreement. Wells was copied on this letter.

44.     Caesars' wholly-independent Compliance Committee is comprised of experienced regulatory experts, all of whom are independent of Caesars' management and report directly to Caesars' Board of Directors. The Compliance Committee thoroughly vetted the facts and circumstances, including those related to the Gansevoort Principal and the Gansevoort Issue.

45.     Donovan informed Spectrum that, *inter alia*, the due diligence investigation by Caesars' Compliance Committee found that there was no evidence supporting media reports and other publicly-available allegations purporting to link the Gansevoort Principal to Russian organized crime. Such unsubstantiated rumors and innuendo stood in stark contrast to the confirmed felony records of Charles Lightbody ("Lightbody") and a second undisclosed principal of FBT Trust, the owner of the Everett Site. It also stood in marked contrast to the Bureau's factual findings and the Commission's unsuitability finding regarding Ourway Realty, whose former principal was actually found by the Bureau to have taken more than $1 million from the Plainville track's money room.

46. Gushin acknowledged receipt of Donovan's May 31, 2013 letter and advised that he would respond, but neither he nor anyone else from or on behalf of the Spectrum ever did so. Wells and the Bureau also did not respond to Donovan's letter.

47. Following Donovan's May 31, 2013 letter and throughout the summer of 2013, Plaintiffs did not receive any further request for information from Spectrum, Wells or anyone else working for or with the Bureau concerning the Gansevoort Principal or the Gansevoort Issue.

48. Caesars remained unaware of Crosby's relationship with Lohnes, and of the investigations that were underway in August of 2013 relating to the hidden felon-investor.

49. In a telephone conversation on September 24, 2013, while the Bureau and criminal investigations of the Everett Site were secretly underway, Wells asked Donovan, on behalf of the Bureau, to meet with her to discuss several issues. When Donovan inquired to which issues Wells was referring, she stated that, although she had not completed her review of the investigative report prepared by Spectrum, she wished to discuss the Gansevoort Issue and an issue pertaining to the Chief Executive Officer of Caesars Interactive Entertainment, Inc.

50. In response, notwithstanding Caesars' own investigation, which did not substantiate the alleged link between the Gansevoort Principal and Russian organized crime that were based upon media and other unsubstantiated reports, Donovan suggested to Wells that Caesars was fully prepared to address the Gansevoort Issue and would be willing to restructure the trademark licensing agreement with Gansevoort. Wells stated that such an action would "go a long way" to addressing the Bureau's concerns. Following this conversation, Gansevoort immediately was notified, thereby initiating the process which could ultimately lead to

termination of the Gansevoort trademark licensing agreement if Gansevoort failed to agree to restructure in order to meet the Bureau's concern.

51.     On October 2, 2013 Donovan and other Plaintiffs' representatives attended a meeting with Wells, representatives from Spectrum, other members of Wells' staff and a representative of the State Police investigative unit working with the Bureau. During that meeting, Wells and the Spectrum representatives expressed their view as to perceived problems with Caesars' due diligence and compliance processes respecting the Gansevoort trademark licensing agreement and stated that the Bureau's investigation had now, very belatedly, raised concerns in addition to the Gansevoort Issue and the issue regarding the Chief Executive Officer of Caesars Interactive Entertainment, Inc., including: (a) Caesars' handling of its relationship with former patron Terrance Watanabe, and (b) Caesars' present financial stability. Neither of these latter two issues had been raised previously.

52.     After the formal meeting on October 2, 2013, SSR's counsel informed Plaintiffs that Wells had informed him that it was not Caesars' due diligence and compliance process that concerned the Bureau, but rather the decision itself of Caesars' independent Compliance Committee, to wit: the decision to allow the trademark licensing agreement with Gansevoort to proceed, notwithstanding the unsubstantiated reports concerning the Gansevoort Principal. This stood in stark contrast to the Bureau's and Commission's handling of (a) the Everett Site land ownership issues involving Lightbody and a second convicted felon, and (b) the apparent continuing financial participation of Ourway Realty in the Penn National Gaming slot parlor proposal notwithstanding the Commission's unsuitability finding.

53.     Prior to this time, Plaintiffs had understood that the Bureau did not have, and had never claimed to have, any concern that represented a material obstacle to Plaintiffs'

participation in SSR's category 1 license application, especially given Caesars' and its affiliates' experiences as operators of casinos in more jurisdictions than any other casino gaming operator in the world, and that Plaintiffs, (a) unlike the Springfield Applicant and the Everett Applicant, had no gaming affiliates in Macau, and (b) unlike the Everett Applicant and Penn National Gaming, had no previous or on-going relationship with persons confirmed to have engaged in unlawful or wrongful conduct, and who stood to benefit financially from the granting of a gaming license.

54. On October 9, 2013, Donovan met in the Bureau's offices in Boston with Spectrum, Wells, other Bureau representatives and a representative of the State Police investigative unit working with the Bureau. The Commission's Executive Director Rick Day was also present at the meeting. Wells acknowledged that Caesars had adhered to its own compliance controls in connection with its diligence of its trademark licensing deal with Gansevoort, had conducted a fulsome background check, and with minor exceptions had presented all material information to the Compliance Committee. However, she asserted that the Bureau continued to have concerns over the Gansevoort Issue. Wells maintained that the evidence of unsuitability was not the adequacy of Caesars' compliance systems or the implementation thereof that concerned the Bureau, but rather the decision of Caesars' independent Compliance Committee to allow an agreement with Gansevoort to proceed. In addition, for the first time, Wells also claimed that the Gansevoort termination should have been taken immediately after the alleged "notice" provided in April 2013, although no such purported "notice" was actually given in April 2013. Wells also claimed that Plaintiffs should have notified their SSR partners about the Gansevoort Issue when the subject arose in the April 2013 interviews, a position that was outside the scope of her authority and that revealed a lack of

knowledge of the contractual agreements between and among the SSR partners. Again, this stood in stark contrast to the Bureau's and the Commission's handling of (a) the Everett Site land ownership issues involving Lightbody and a second convicted felon, and (b) the apparent continuing financial participation of Ourway Realty in the Penn National Gaming slot parlor proposal. Indeed, during the May 8, 2014 hearing on the City of Boston's request for host community status, the City questioned the lack of due diligence on the part of Wynn Resorts in failing to discover the fraudulent concealment of one or more felon-owners of the Everett Site. Commissioner James McHugh, the acting Chairman in Crosby's absence, deemed this alleged failure in diligence irrelevant to the matter of Wynn Resort's suitability "[b]ecause suitability under our statute and regulations applies to those who are going to be involved in the operation of the gaming facility." Gansevoort, which was extensively vetted by Caesars' experienced independent Compliance Committee, had nothing to do with Plaintiffs' or any of its affiliates' operation of any gaming facility, in Massachusetts or elsewhere; but the Bureau applied a shockingly different standard in recommending that Plaintiffs be found unsuitable.

55.     Continuing its efforts to address the Bureau's alleged and shifting concerns, and unaware of the more lenient standards being applied to other applicants and qualifiers, on October 10, 2013, Caesars called a special Compliance Committee meeting where the new information from the Bureau was presented, including the fact that no cure would be acceptable to the Bureau at this junction. At the conclusion of the meeting, the Compliance Committee directed that the Gansevoort trademark licensing agreement be terminated immediately, which was done.

56.     On or about October 11, 2013, Wells represented to Caesars CEO Loveman that she would tell him on October 15, 2013, the Tuesday after Columbus Day, what the Bureau's

recommendation would be as to Plaintiffs' suitability. Wells informed Loveman that, if Plaintiffs withdrew immediately, she would issue her report without any recommendation regarding suitability; but, if Plaintiffs did not withdraw, she would file her report the following day with a recommendation. On information and belief, before taking these positions with Caesars, Wells consulted with the head of the State Police investigative unit assigned to work with the Bureau and with Crosby, and was aware of and influenced by Crosby's views. Given that (a) the unsubstantiated allegations against the Gansevoort Principal were both unproven and unrelated to the gaming industry, (b) the Gansevoort Issue had been put to rest by the termination of the trademark licensing agreement, and (c) other applicants were proceeding in Massachusetts with Macau affiliations, and with affiliations with known felons and/or financial wrongdoers, all of which affiliations were more significant than the attenuated and terminated Caesars' affiliate's relationship with the Gansevoort Principal, Loveman was stunned by Wells' statements.

57.     On October 14 or 15, 2013, David Satz, Vice President Government Relations of Caesars ("Satz"), placed a call to Spectrum's Gushin, who was traveling in Japan at the time. Satz had been acquainted with Gushin for many years, dating back to Satz's own tenure as a gaming regulatory lawyer in New Jersey. Concerned about the absence of any decision from Wells as to what the Bureau's recommendation would be, against the backdrop of rumors and suggestions that Wells had already determined that she would recommend a finding of unsuitability as to Plaintiffs, Satz asked Gushin what was going on. Gushin, in language that Satz recognized when Spectrum was advising a favorable recommendation, assured Satz that Spectrum had already advised the Bureau that Spectrum had found no reason to conclude that Plaintiffs were unsuitable. Based upon Gushin's statements in the conversation, Satz concluded

-23-

that Spectrum's investigation and report to the Bureau were complete, and that Gushin believed that the Bureau would issue a recommendation of suitability with conditions as to Plaintiffs.

58.     On October 15, 2013, Wells refused to provide Loveman with an answer as to her impending recommendation regarding Plaintiffs' suitability.   On that same date,  Wells learned through the testimony of Lohnes' associate Dustin DeNunzio that he had backdated certain critical legal documents pertaining to ownership of the Everett Site, in an effort to obfuscate whether and when Lightbody ceased to hold an interest in that property.   Although Wells had known since August 9, 2013 about Crosby's relationship with Lohnes and apparently about the pending criminal investigation, she did not disclose any such information to Loveman, or to anyone affiliated with Caesars.   Nor did the Bureau issue a report recommending unsuitability as to the Everett Applicant or any of its qualifiers.   Indeed, the Commission found the Everett Applicant suitable conditioned upon satisfaction with the applicant's operations in Macau; and, while accepting the Everett Applicant's proposal of a cost reduction and a sworn statement from the named owners that they would be the sole recipients of the purchase price, the Commission did nothing when one of those owners refused to provide such a sworn statement.

59.     According to Plaintiffs' partners in SSR and asserted upon information and belief in reliance thereon, Wells told Plaintiffs' partners in SSR that SSR should start searching for a new operator because Plaintiffs were in trouble, before she informed Plaintiffs of the Bureau's recommendation.   This occurred on or about the same day, October 15, 2013, that the Bureau took testimony regarding the hidden participation of one or more felons in ownership of the Everett Site, including the testimony from Lohnes' associate Dustin DeNunzio that he had backdated certain critical legal documents in an effort to obfuscate whether and when Lightbody

ceased to hold an interest in that property. Yet, Mr. Wynn and the Everett Applicant received no instruction to seek an alternate site.

60.     Also according to Plaintiffs' partners in SSR and asserted upon information and belief in reliance thereon, a high-ranking official of the City of Boston informed an SSR partner that SSR needed to replace Plaintiffs, before Wells informed Plaintiffs of the Bureau's impending recommendation.

61.     Donovan informed SSR's legal counsel on October 15, 2013 that, in the event of a negative recommendation, Plaintiffs intended to go forward with the adjudicatory hearing with regard to their suitability and to request an adjudicatory hearing in 30 days to dispute the anticipated finding of unsuitability. Plaintiffs required the 30 day period in order to prepare their best case in favor of a finding of suitability.

62.     On October 16, 2013, during the period when information regarding the impending recommendation was being withheld from Plaintiffs but conveyed to Plaintiffs' partners in SSR and to the City of Boston, SSR sent an "Unsuitability Notice" to Plaintiffs. An "Unsuitability Notice" is a letter required by the agreement with SSR in the event that a "Licensing Event" occurs. Under the agreement, a "Licensing Event" occurs when any member of SSR receives any communication from a gaming authority that indicates that a gaming authority may find SSR or any of its members unsuitable for obtaining a gaming license.

63.     On October 16, 2013, before the Bureau's recommendation had been issued, counsel to SSR advised Plaintiffs that he and another attorney on behalf of SSR had met with Wells and Catherine Blue, the Commission's General Counsel ("Blue"), that morning. According to one of the SSR attorneys, Wells and Blue informed the latter attorneys that the Commission would be announcing the schedule for the hearing within 24 hours of finalizing the

recommendation report (thereby suggesting that the report was still not finalized, notwithstanding Gushin's comments to Satz a day or two earlier about the status of Spectrum's advice and report to the Bureau), with the hearing to occur before the end of October 2013. According to the SSR attorney, Wells and Blue told him and his colleague that, if Plaintiffs withdrew immediately, they could do so as a matter of right, but that a later withdrawal would require approval by the Commission.  Rather than encouraging Plaintiffs to stick with the process and proceed with a suitability hearing, as Crosby did with the Everett Applicant in regard to the Macau situation, Wells and Blue encouraged Plaintiffs to withdraw, and to do so expeditiously to avoid other ramifications of an unfavorable suitability recommendation.

64.     In addition, SSR's attorney further reported that Wells and Blue stated that there was nothing Plaintiffs or SSR could do to prevent the suitability hearing from occurring by the end of October, despite the "30 days" notice language in the Commission's regulations and despite the language in the Massachusetts Administrative Procedures Act.  This stood in stark contrast to the treatment of the Everett Applicant, whom the Commission accommodated with regard to allowing the referendum to occur before the suitability hearing, at the request of Mr. Wynn made directly to Crosby.  In their conversation with SSR's attorneys, Wells and Blue took the position that the Commission could schedule a hearing at any time on its own initiative. Upon information and belief, Wells consulted with Crosby before taking this position.

65.     In the same communication, SSR's attorney also advised Plaintiffs that Wells (a) indicated that she intended to send the Bureau's letter and report to the Commission the following day, October 17, 2013, and (b) reiterated her earlier statement that, if Plaintiffs withdrew immediately, she would refrain from making any suitability recommendation.

66.     Notwithstanding the pressure exerted upon Plaintiffs by Wells, upon information and belief in consultation with Crosby, as conveyed by the SSR attorney, Plaintiffs commenced preparation for a suitability hearing that they understood could not occur in less than 30 days, for the reasons alleged in the following three paragraphs.

67.     The Commission's regulations (205 CMR 101.01 *et seq.*) establish that the Commission will hold adjudicatory hearings to, among other things, hear contests of any factual findings by the Bureau relative to suitability, and make phase 1 suitability determinations.  The process for reviewing suitability recommendations by the Bureau laid out in the regulations gives an aggrieved applicant 30 days to request a hearing.

68.     The Commission's regulations provide that the Commission, after receiving the recommendation of the Bureau, "shall initiate a process for a public hearing or adjudicatory proceeding."  205 CMR 115.04(1).  Subsection (2) provides the applicant a 30-day window to give a notice of claim requesting a hearing.  That 30-day period runs from the date that an applicant, here SSR, is given notice of the Bureau's recommendations.

69.     Additionally, the Massachusetts Administrative Procedures Act requires that a party "shall have sufficient notice of the issues involved to afford them reasonable opportunity to prepare and present evidence and argument."  M.G.L. c. 30A, § 11(1).

70.     Wells, willfully ignoring the requirements of the law and regulations, informed Plaintiffs' partners in SSR that the Bureau expected the suitability hearing to occur before the host community referenda scheduled for November 5, 2013 in both East Boston and Revere.

71.     To justify this foreshortened period that would leave Plaintiffs unable to prepare fully for a suitability hearing, Wells stated that the Commission needed to have the hearing before the referendum to avoid the impression that the Commission was hiding anything from

-27-

the voters.  However, the Everett referendum respecting the Everett Applicant's project occurred in June of 2013, and the suitability hearing occurred on December 16, 2013, six months after the referendum.  This came about when Mr. Wynn, on behalf of the Everett Applicant, placed a phone call to Crosby, informing him that the Everett Applicant needed the referendum to occur before he could purportedly obtain other approvals for the waterfront Everett Site.  According to Mr. Wynn, "Crosby thanked me for enlightening him on this point," and the Commission reversed its position that the suitability hearing needed to precede the referendum.  *See*  full transcript  of  Interview  by  *CommonWealth*  magazine  with  Mr.  Wynn, http://www.commonwealthmagazine.org/Voices/Conversation/2014/Spring/002-Dont-bet-against-me-Full-Transcript.aspx.  Similarly, a referendum regarding a proposal by another applicant in Springfield (the "Springfield Applicant") took place in July of 2013, whereas the Commission held a suitability hearing on December 9, 2013, five months after the referendum.  Indeed, Plaintiffs are unaware of any other applicant apart from SSR—the sole competitor of the Everett Applicant—that was required to have a suitability hearing prior to a referendum.  The Commission's regulations provide that the host community election may occur prior to a positive determination of suitability if the community's governing body approves of holding the election and voting households are informed about the standards and procedures for suitability determinations and that, notwithstanding the outcome of the election, no license will be issued without a finding of suitability.  Those steps had been taken with regard to the SSR proposal in which Plaintiffs were participating.

72.     Plaintiffs declined to withdraw immediately as Wells suggested; and, on the evening of October 18, 2013, Plaintiffs received the Bureau's recommendations to the Commission pertaining to Plaintiffs ("Plaintiffs' Suitability Report").  The recommendations

included that the Commission find that Caesars "has **not** met its burden by clear and convincing evidence to establish its suitability" (emphasis in original), and that the Commission find SSR suitable if Caesars were not part of the project. Because the Gaming Act places the burden on the applicant to demonstrate suitability, the statement that Caesars had failed to establish suitability is effectively a recommended finding of non-suitability, rather than a neutral point. *See* M.G.L. c. 23K § 12; 205 C.M.R. 115.01(2) ("Burden of Proof. All applicants for a Phase 1 suitability determination must establish their qualifications by clear and convincing evidence.").

73. On information and belief, based on a review of all publicly available information, no other suitability recommendation issued by the Bureau, all of which were signed by Wells, has utilized this language. *See* July 2, 2012 Ourway Realty, LLC Recommendation Letter ("The [Bureau] recommends that the Commission find the applicant, Ourway Realty, LLC, suitable for licensing subject to the following condition...," this notwithstanding the Bureau's finding that Ourway's former principal had taken more than $1 million from the track's gaming room) (the Commission thereafter found Ourway unsuitable because it had "failed to satisfy its burden of proving its suitability by clear and convincing evidence"); July 3, 2013 PPE Casino Resorts, MA LLC Recommendation Letter ("The [Bureau] recommends that the Commission find the applicant, PPE Casino Resorts, MA LLC, suitable for licensing."); July 3, 2013 Raynham Park, LLC Recommendation Letter ("The [Bureau] recommends that the Commission find the applicant, Raynham Park, LLC, suitable for licensing subject to the following conditions..."). In terms of the Bureau, the language appeared only in Plaintiffs' Suitability Report, relating to the sole competitive applicant to the Everett Applicant, When similar language was used by the Commission, it was in the context of a situation where the

Bureau found that the former Ourway principal had taken in excess of $1 million from the track's money room, a far different circumstance from that presented by the Gansevoort Issue.

74. Most tellingly, the Bureau has even issued a report, signed by Wells, for a category 1 applicant, despite finding that applicant's application materially incomplete. Notwithstanding that circumstance, Wells and the Bureau nevertheless refrained from making a final recommendation as to whether that applicant met its burden of proof respecting suitability. Rather, Wells' letter merely declined to make any recommendation at all to the Commission regarding that applicant's suitability.

75. After receipt of Plaintiffs' Suitability Report on the evening of October 18, 2013, SSR requested that Plaintiffs and their related qualifiers withdraw from SSR's application for a category 1 gaming license, so that SSR could proceed with the project.

76. While believing the Bureau's position to be wholly without merit, and while intending to appear before the Commission to advocate for a finding of suitability, Plaintiffs acknowledged SSR's concerns, and acquiesced in their partners' request that they withdraw. Plaintiffs did so with no knowledge of Crosby's conflict of interest or of the ongoing investigations into the owners, including Lohnes, of the Everett Site. Plaintiffs acquiesced in substantial part because (a) they were unaware of (i) Crosby's conflict of interest and personal bias, (ii) Wells' and the Bureau's and federal and state law enforcement investigations into the owners of the Everett Site, and (iii) the accommodation requested by Mr. Wynn and received by the Everett Applicant relating to sequencing the suitability determination and the referendum; (b) the comments made by Wells and Blue to SSR's counsel regarding Plaintiffs' ability to avoid an apparently unfavorable suitability recommendation, and their ability to withdraw as a matter or right if they did so immediately, were clearly intended to discourage Plaintiffs from proceeding;

and (c) Plaintiffs could not adequately prepare for a suitability hearing in the foreshortened time period that was being foisted upon them by Wells and Blue, upon information and belief, in consultation with Crosby. On information and belief, no other major operator was treated in this fashion, and at least one (the Everett Applicant) was (a) actually affirmatively encouraged by Crosby to stay in the process, and (b) accommodated with regard to the chronology of the referendum and the suitability hearing bas a result of Mr. Wynn's direct personal appeal to Crosby. Again, only Plaintiffs, as qualifiers for the sole applicant in competition with the Everett Applicant, were treated in this manner.

77. By successfully placing Plaintiffs in a position where they had no choice but to withdraw while ignorant to Crosby's conflict and bias, as well as the Everett Site ownership issues, and in order to allow their SSR partners to proceed, Wells—upon information and belief in consultation with Crosby—left SSR with no casino operator a mere eighteen days before the East Boston and Revere referenda, thereby effectively eviscerating the existing SSR application and likely leaving the Everett Applicant without competition.

78. Plaintiffs indicated their intent to withdraw on the evening of Friday, October 18, 2013, and effectuated the withdrawal on Columbus Day, Monday, October 21, 2013 via a letter to Crosby.

79. The news of Plaintiffs' withdrawal spread quickly, and immediately became the headline story on *The Boston Globe*'s news website, boston.com, and on the local evening news programs in the Boston market.

80. On Tuesday, October 22, 2013, *the first business day after Plaintiffs effectuated their withdrawal*, Crosby notified the State Ethics Commission (but not Plaintiffs or the public) of his relationship with Lohnes. On information and belief based upon (a) Crosby's knowledge

of the conflict since the latter part of 2012, (b) Crosby's notice of the investigations of the owners of the Everett Site including Lohnes, (c) Crosby's notification to the State Ethics Commission on the first business day after receipt of Plaintiffs' withdrawal letter, and (d) Crosby's failure to inform Plaintiffs of his relationship with Lohnes or of the investigations before Plaintiffs withdrew, Crosby intentionally held up the notification about his conflicts to Plaintiffs, to the Ethics Commission, and to the public until he was sure that Plaintiffs were out of the licensing picture.

81.    On October 29, 2013, the Commission held an adjudicatory hearing on SSR's suitability, without Plaintiffs' participation.

82.    After Plaintiffs' withdrawal, Plaintiffs were advised by Blue that, while anyone was free to attend a public hearing, it was unnecessary for them to appear at the hearing, since issues pertaining to Plaintiffs' suitability would not be the focus of the hearing.    In reliance on that advice, Plaintiffs did not appear or ask to be heard, believing that this would be the least disruptive course of action.

83.    Contrary to the advice provided, the hearing involved an extensive assault on Plaintiffs' integrity, which Plaintiffs had no opportunity to rebut.  These included misstatements and misrepresentations made by Crosby.  Although Wells knew some of the statements to be false, including without necessary limitation Crosby's description of the April 2013 interview between Spectrum, a Massachusetts state police representative and Donovan, she sat by silently.

84.    Examples of Crosby's misstatements and misrepresentations include, without necessary limitation, his assertions relating to the Gansevoort Issue, which were discussed extensively.  According to Crosby, this discussion was necessary "because it's important for people to understand who knew what when."  In the course of that discussion, Crosby distorted

the historical record, stating that "our Investigations Bureau raised the issue at least of the Gansevoort question with Caesars with some significant force in April, six months ago."

85.     Crosby's statement was false.  It also stood in stark contrast to his treatment of the involvement of a convicted felon with the Everett Site. Wells, who was involved in the events referenced by Crosby, and therefore knew the statement to be false, said nothing to correct the public misstatement.  As alleged above, in April 2013, Spectrum questioned certain of Caesars' employees and certain members of Caesars' Compliance Committee regarding several issues, including the Gansevoort Issue.  Based on these questions, Donovan wrote the May 31, 2013 letter to Spectrum, which provided further detail on Caesars' extensive due diligence review and compliance process for the Gansevoort Principal and Gansevoort.  In that letter, Donovan requested that Spectrum contact him respecting any issue that remained after receipt of the letter. A copy of that letter was also sent to Wells.  No issue respecting the Gansevoort Issue was raised by the Bureau or Spectrum or anyone else again with Donovan until the September 24, 2013 telephone call with Wells.  In addition, the trademark licensing agreement with Gansevoort was terminated by Plaintiffs' affiliate to assuage the Bureau's concerns, a fact that neither Crosby nor Wells acknowledged.

86.     Moreover, despite Crosby's statement at the October 29, 2013 hearing, that "it's important for people to understand who knew what when," Crosby failed to hold himself to that same standard by, *inter alia*, his continuing failure and refusal to disclose to Plaintiffs, the Ethics Commission, and the public, his conflict of interest, the underlying facts respecting his conflict of interest, his communications with Mr. Wynn, and the investigations respecting the Everett Site and its ownership.

87.     At SSR's October 29, 2013 suitability hearing, Crosby also baselessly impugned the integrity and competence of Caesars' Compliance Committee, stating that in order to "protect against slipping" standards, it is important to "empower" people who are willing to "say the unpopular thing," and implying that Caesars' Compliance Committee lacks such individuals.

88.     Caesars' Compliance Program has been reviewed and approved by gaming regulators in Mississippi, Nevada and New Jersey, and has been repeatedly reviewed by gaming regulators in other jurisdictions as part of routine gaming regulatory reviews.   Caesars' Compliance Committee is comprised of some of the most experienced regulatory experts in the world.   At present, the Compliance Committee consists of five members, all of whom are independent of Caesars' management and report directly to Caesars' Board of Directors.   The members include:   (a) a former and the longest-serving Chair of the Nevada Gaming Control Board; (b) a former Member and Deputy Chief of the Nevada Gaming Control Board; (c) a former bank chairman; (d) a former business executive in the food and drug retail area; and (e) a former Supervisory Special Agent of the Federal Bureau of Investigation, who served as Managing Director of the Compliance Department for Park Place Entertainment, Inc., a predecessor company to Caesars from 1998 through 2000 and as Chief Compliance and Regulatory Officer of Caesars from 2000 through 2005.

89.     Crosby's suggestion that the members of the Compliance Committee are either incapable of making difficult decisions or unwilling to "say the unpopular thing" was untrue, and served to impugn Caesars' and the Compliance Committee's reputations without basis.   Crosby's statement in a public forum was also at odds with the Bureau's report, which states that its investigators found that "the Compliance Department conducted appropriate due diligence in this matter."

90.     Wells also withheld material information at the hearing, and from Plaintiffs. Specifically, she failed to disclose that Spectrum had, in fact, as detailed more fully herein, offered its advice to the Bureau that Plaintiffs' Suitability Report contain a recommendation that Plaintiffs be found suitable by the Commission.  Instead of disclosing this critical information, Wells repeated her statement that Caesars had failed to meet its burden of proving suitability. She neither disclosed what Spectrum's proffered advice had been, nor did she explain why the Bureau disregarded that advice.

91.     Plaintiffs only learned that Spectrum had advised Wells to recommend a finding of suitability, as Gushin had implied to Satz on October 14 or 15, 2013 (see ¶ 51 above), as a result of information conveyed by a Spectrum principal to Loveman, after Plaintiffs had withdrawn.  Specifically, Michael Pollock, another Managing Director of Spectrum ("Pollock"), visited Loveman and informed him that (a) Spectrum had advised the Bureau to recommend that Plaintiffs be found suitable, and (b) Spectrum had routinely responded when queried by other state agencies that Caesars was among the top operators in the industry.

92.     Based upon Gushin's and Pollock's statements to Satz and Loveman respectively, and upon Blue's contention to SSR's attorneys on October 16, 2013 that Plaintiffs' Suitability Report was not yet finalized, Plaintiffs allege upon information and belief that Wells, in consultation with Crosby,  ignored Spectrum's advice that the Bureau recommend a finding of suitability and changed it to a recommendation that Plaintiffs be found unsuitable by virtue of failing to meet their burden of proving suitability.

93.     On Election Day, November 5, 2013, referenda were held in East Boston and in Revere on the SSR project.  While voters in Revere approved the SSR project, voters in East Boston rejected it by a substantial margin.

94. The "No" vote in East Boston left confusion and uncertainty about the SSR project, in particular as to whether and how the project might proceed on the Revere portion of the SSR site.

95. The "No" vote in East Boston left the Everett Applicant's group as the leading contender for the category 1 license in Region A.

96. As noted above, on October 22, 2013, the first business day after Plaintiffs' withdrawal, Crosby contacted the State Ethics Commission and privately disclosed his long-standing business and personal relationships with Lohnes and the possible conflicts of interest that they posed in his evaluation of the various applications in Region A.

97. The Ethics Commission privately responded on October 24, 2013, and recommended that Crosby provide more details about the relationships, Lohnes' involvement in the proposal and development, and particular issues that had arisen or were anticipated. Without explanation, the Ethics Commission applied the traditional ethics standard for state employees instead of the applicable enhanced ethical standard for the Commission. On the basis of the less stringent standard, the Commission indicated that Crosby could then continue to perform his duties "using objective criteria when you do so."

98. On October 25, 2013, Crosby filed another disclosure, adding the name of the business in which he had partnered with Lohnes, the fact that they had recently run into each other in the Commission offices, and the fact that the Everett Site, which was and is partially owned by Lohnes—the site of a former Monsanto manufacturing facility—apparently has significantly greater value with a gaming license than with other plausible uses.

99. In November 2013, the Everett Site came under increasing scrutiny when the press reported that federal agents and the state attorney general were investigating whether that

site involved a secret investor with a felonious criminal record. Most recently, in October 2013, the subject individual, Lightbody, had been arrested for assault and battery for punching an organizer of a pro-SSR rally in Revere. Shortly after the investigation was made public, on or about November 22, 2013, Crosby came to the Everett Applicant's defense, inappropriately offering his opinion to the media that "just having read the newspaper report, this had nothing to do with Wynn. That was nothing Wynn knew about." The statement was either made without factual basis, or is indicative either of communications between Crosby and Mr. Wynn or his representatives about a subject that was theretofore not publicly known, or of communications between Crosby and Wells regarding the Bureau's investigation.

100. On November 20, 2013, only one or two days before Crosby came to Wynn Resorts' defense, the U.S.-China Economic and Security Review Commission ("the US-China Commission") issued its 2013 Report to Congress ("Report to Congress" or "Report"). The U.S.-China Commission was careful to note that it neither looked for, nor found, any wrongdoing on the part of U.S.-based gaming operators, nor do Plaintiffs suggest here that any such wrongdoing occurred with regard to either the Springfield or Everett Applicants. Nonetheless, the Report to Congress sounded an alarm regarding the Macau gambling industry, and more particularly to a segment of that industry involving VIP gaming room operations run within, but separate from, casinos located in Macau. According to the Report to Congress, the U.S.-China Commission was informed that "it is common knowledge that the operation of VIP rooms in Macau casinos had long been dominated by Asian Organized Crime (AOC), commonly referred to as 'triads.'" Report at p. 361. The U.S.-China Commission spoke in stark terms of the risks posed by this criminal activity, and, in particular, of money laundering risks associated with Macau's VIP gaming room operations. Because the movement of funds through this

structure is "poorly understood," the Report notes that the structure "may pose particular money laundering risks, e.g., international movement of funds for casino junket operations." *Id*. at p. 356. The U.S.-China Commission further notes that that U.S.-based casino companies are subject to state suitability requirements and that the implementation of strict safeguards in the Macau casinos of these operators, including special safeguards put in place by affiliates of the Springfield and Everett Applicants, may be at risk because of "the grey market nature of Macau's loosely regulated junket operators and underground banking system." *Id*. at p. 358. All of this may lead to "the possibility for exploitation of casinos by international criminals seeking to launder illicit funds." *Id*.

101. Despite the alarms sounded by the U.S.-China Commission, Crosby made no reference to the Report in his statements in defense of Wynn Resorts, or at any other point in the suitability proceedings described below. Nor did Wells or the Bureau acknowledge the Report in the recommendations that followed its issuance, even though the concerns regarding the relationship of affiliates of Applicants in Macau should have been more significant than the concerns relating to the Gansevoort Principal.

102. On December 5, 2013, in a blog posted on the Commission's website, Crosby announced that he was recusing himself from the December 13, 2013 public meeting concerning the Everett Applicant's land transaction and its renegotiation following the investigation of the alleged secret investor. The statement about the concerns over the land ownership includes the parenthetical statement that it "involved, among others, an individual with whom I had a business relationship 23 years ago." He adds "[b]ecause of my prior business relationship with one of the parties, I immediately recused myself from all Commission and staff deliberations on this matter, and filed the required disclosure documentation with my appointing authority, the

Governor, and with the State Ethics Commission," referring to the August and October 2013 disclosures and the Ethics Commission's October 24, 2013 letter, which are linked to the blog. This statement, which was issued one and a half months after the Bureau's unfavorable suitability recommendation respecting Plaintiffs, constituted the first public disclosure, albeit a partial disclosure, of Crosby's conflict. The timing of this disclosure, more than a year after Crosby knew of the conflict, is itself tainted, because Crosby's adverse actions affecting Plaintiffs, as alleged above, preceded the disclosure. Crosby did not at that time recuse himself with regard to Region A deliberations more broadly or to the suitability hearing for the Everett Applicant specifically.

103. As suitability hearings have continued following Plaintiffs' withdrawal, the disparate standard applied by Wells and Crosby to Plaintiffs has become starkly apparent, and the inequity conspicuously egregious. In addition to the incomplete application described in paragraph 74 above, recent recommendations of Wells and the Bureau, and the resulting favorable findings made by Crosby and the Commission, compel the inference that factors unrelated to the relative merits of the applicants and qualifiers are involved, such as Crosby's belatedly disclosed conflicts and the existence or appearance of cronyism based on personal and former professional relationships among various Bureau investigative participants and employees or consultants to the Everett Applicant.

104. With regard to disparate treatment, the Bureau's recent recommendation relating to another applicant (referred to herein as the "Springfield Applicant"), for example, employed a different standard altogether from that applied to Plaintiffs: "[T]he [Bureau] advises the Commission that … it has not discovered any disqualifying factors that would necessarily preclude the Applicant from being issued a Category 1 Gaming License," i.e., the same language

that Gushin told Satz on October 14 or 15, 2013 Spectrum had advised be included in Plaintiffs' Suitability Report. The Springfield Applicant's suitability report goes on to make a conditional recommendation that "the Commission find the applicant … suitable for licensing subject to the following conditions..." The conditions appear to relate to concerns raised, but not addressed, during the Bureau's investigation of that applicant.

105. More specifically, conspicuously absent from the Bureau's suitability recommendation to the Commission relating to the Springfield Applicant (though discussed in its investigative report) is any mention of the Report to Congress or of a former fifty-percent gaming partner of the Asian affiliate of the Springfield Applicant in Macau (the "Macau Partner"). An investigation by the New Jersey Division of Gaming Enforcement ("NJDGE") of the New Jersey Casino Control Commission (the "New Jersey Commission") resulted in a report suggesting that the fifty-percent partner was not independent of a family member whom the applicant acknowledged was unsuitable. In fact, in 2009, in connection with the Springfield Applicant's application for a license renewal in New Jersey, the NJDGE issued a Special Report concluding that the Springfield Applicant's association with the Macau Partner compromised the Springfield Applicant's suitability for a gaming license in New Jersey, based on serious concerns that the Macau Partner was being controlled and influenced by the family member. Prior to a final determination by the New Jersey Commission, the Springfield Applicant entered into an agreement with the NJDGE to place its interest in the New Jersey casino into a trust for subsequent disposition and withdrew its pending application for a renewal of its New Jersey gaming license until such issues could be addressed. The Massachusetts Bureau's Investigative Report regarding the Springfield Applicant discusses this incident. Yet, the issue did not make it into the Bureau's recommendation letter to the Commission, and did not prevent the Bureau

from recommending that the Commission find the Springfield Applicant suitable subject to certain conditions.

106.    At the Commission's suitability hearing relating to the Springfield Applicant on December 9, 2013, the Commission accepted the recommendation of the Bureau and Wells, despite the issues described above.  Those issues were similar to, but more egregious than, the Gansevoort Issue that purportedly formed a principal basis for the unfavorable recommendation as to Plaintiffs' suitability.  The Bureau recommended, and the Commission found, suitability in the face of the Report to Congress and of a serious investor issue that had, for a time, disqualified the Springfield Applicant in a major U.S. gambling venue.  The Macau relationship in general, and the Macau investor relationship in particular, were more serious in nature than the Gansevoort Issue and the Gansevoort Principal, the first of which was entirely unrelated to the gaming industry and had, in any event, been terminated, and the second of which was entirely unsubstantiated.

107.    With regard to the Everett Applicant, Wynn Resorts, the only other applicant for the Region A license apart from SSR, the Commission held a hearing pertaining to ownership of the Everett Site on December 13, 2013, from which Crosby recused himself.  The hearing related to information exposed by *The Boston Globe* about the secret investor.  The remaining Commissioners voted to allow the licensing process to proceed after the Everett Applicant announced that it was slashing its option price for the land purchase from $70 million to $35 million, the latter being the purported fair market value for the old contaminated manufacturing site without the possibility of a casino.  The Commission did not appear to question how the fair market value of the contaminated site had increased from $8 million to $35 million in less than five years.  Crosby did not recuse himself from the determination of the Everett Applicant's

-41-

suitability, and, upon information and belief, took steps to determine the recommendations in advance of the hearing. At the Commission's suitability hearing relating to the Everett Applicant on December 16, 2013, Wells filed a report recommending a finding of suitability with conditions, notwithstanding (a) issues pertaining to the Applicant's affiliate in Macau; (b) the secret investor and the on-going investigation by law enforcement; and (c) Crosby's personal and former business relationship with Lohnes, one of the principal land owners of the Everett Site. Upon information and belief, Wells consulted with Crosby before making her recommendation. The Commission accepted the recommendation and made a finding of suitability with conditions. In the course of the hearing, for reasons that she did not explain, Wells shut down the examination by the Bureau's outside counsel when he began to inquire about the Everett Applicant's due diligence relating to the ownership of the Everett Site.

108.    Plaintiffs take no position on the suitability of other applicants and note that all of them have been found suitable by numerous gaming regulators. Rather, Plaintiffs believe that they have been discriminated against and deprived of their Constitutional and contractual rights by virtue of the acts and actions of Crosby and Wells as described herein. As alleged in paragraphs 34 and 35 above, Crosby belatedly recused himself from the Region A licensing process on May 8, 2014. On May 12, 2014, in response to Crosby's recusal from the Region A licensing process, Plaintiffs requested, *inter alia*, that the Commission declare the Caesars Suitability Report a nullity as the product of an unconstitutionally flawed process, remove the Report from its website, cease its dissemination, and notify all prior recipients that the Report has been rescinded ("Plaintiffs' Request"). *See* Ex. 1 hereto. Although Crosby recused himself from the Region A licensing process, he did not resign from his position as Chair, or otherwise abdicate his statutory supervision and control of the Commission. As of the date of filing of the

Motion for Leave to file this Third Amended Complaint, the Commission has not responded to Plaintiffs' Request. As Chair of the Commission, Crosby is empowered to cause the Commission to comply with Plaintiffs' Request; but he has not done so, thereby further violating Plaintiffs' constitutional rights and causing continuing injury.

109. There is no reasonable, non-discriminatory basis for the difference in the consideration and treatment by Wells and the Bureau, or by Crosby and the Commission, of Plaintiffs, on the one hand, and other applicants, on the other. Nor has either Defendant proffered any reasonable explanation as to why Plaintiffs have been held to a different and higher standard than every other applicant. Such disparate treatment continued through the Everett Site land ownership hearing and the Everett Applicant's suitability hearing in December 2013; through the slot licensing process culminating in the Penn National Gaming license award on February 27, 2014; and through the continuing Region A licensing process that is on-going at this time. The violations of Plaintiffs' rights also continue because Crosby and Wells (a) have caused the flawed Report to remain posted from day to day on the Commission's website, (b) have caused the Report to be disseminated to persons and entities other than Plaintiffs themselves, and, in the case of Crosby because (c) he has not directed or caused the Commission to comply with Plaintiffs' Request. Such continuing publication and dissemination cause Caesars injury in every venue in which a Caesars affiliate is a gaming operator and in each new venue in which a Caesars affiliate applies for a gaming license. Recommendations and findings must be disclosed by Caesars, and gaming authorities are authorized by law to share recommendations and findings with each other. As a result, Caesars is incurring costs and expenses in connection with investigations initiated by gaming regulatory authorities in other jurisdictions relating to the circumstances described in the Constitutionally flawed Report, and

these investigations could lead to negative consequences in such other jurisdictions, including fines.

110.    As noted above, Wells exercises and discharges her official duties as Director of the Bureau "subject to the direction, control and supervision of the chair."  M.G.L. c. 23K § 6(a); ¶ 14 *supra*.  On information and belief, Wells' conduct in this regard has been and is influenced by Crosby. Plaintiffs require discovery to confirm whether personal and former professional relationships among Wells and other participants in the investigative process, on the one hand, and employees or consultants to the Everett Applicant, on the other, have also influenced Wells' conduct.

111.    In conducting the suitability review of Plaintiffs and others, Crosby and Wells were acting under color of state law.

112.    These actions, both coordinated and uncoordinated, under color of the Commission's regulatory and investigatory powers, have deprived Plaintiffs of the economic value of their investments in and respecting SSR, including tens of millions of dollars expended to support SSR's application process.

113.    These deliberate actions to deprive Plaintiffs of their constitutional rights are so flagrant and offensive as to shock the conscience and compel judicial intervention.

114.    Crosby's conduct was and is arbitrary and capricious and shocks the conscience.

## COUNT I

**Violations of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution (Procedural and Substantive Due Process) v. Defendant Crosby in His Official and Individual Capacities**

115.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

116. By virtue of Plaintiffs' compliance with the Gaming Act and the investment of tens of millions of dollars in the license application process, Plaintiffs were possessed of property rights, *inter alia*, in their business association with SSR and to non-discriminatory, unbiased and fair consideration in the license application process. Plaintiffs do not claim a property right in the Region A gaming license.

117. Crosby's conduct under color of state law, as more fully alleged above, constituted discriminatory, biased and unfair disruption of Plaintiffs' participation in their business association with SSR and in the licensing process.

118. Crosby's conduct under color of state law, as more fully alleged above, violated and continues to violate Plaintiffs' constitutionally protected property rights as secured under the Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

119. By manipulating and abusing his investigatory and adjudicatory power to interfere with Plaintiffs' and their partners' category 1 gaming application, Crosby has deprived and continues to deprive Plaintiffs of the enjoyment of their constitutionally protected property rights without due process of law.

120. Crosby has intentionally and wrongfully singled out Plaintiffs for adverse treatment relating to their protectable and legitimate interests in the fair and impartial consideration of Plaintiffs' suitability to participate as a partner in the SSR application for a category 1 gaming license.

121. Crosby's adverse treatment of Plaintiffs was and is arbitrary and irrational, without authority under the law, and motivated by malicious and bad faith intent to block the fair and impartial consideration of SSR's application.

122.     Crosby's intentional misconduct has violated and continues to violate Plaintiffs' procedural due process rights to an application process that is non-discriminatory, unbiased and fair.

123.     Crosby's intentional misconduct has violated and continues to violate Plaintiffs' substantive due process right not to be deprived of the use of their property except by laws, regulations or government actions that are rationally related to a legitimate governmental interest.

124.     Plaintiffs have suffered, and continue to suffer, economic and reputational injuries as a result of Crosby's wrongful acts and omissions for which Crosby is liable under the provisions of 42 U.S.C. § 1983.

## COUNT II

**Violations of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution (Procedural and Substantive Due Process) v. Defendant Wells in Her Official and Individual Capacities**

125.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

126.     By virtue of Plaintiffs' compliance with the Gaming Act and the investment of tens of millions of dollars in the license application process, Plaintiffs were possessed of property rights, *inter alia*, in their business association with SSR and to non-discriminatory, unbiased and fair consideration in the license application process.  Plaintiffs do not claim a property right in the Region A gaming license.

127.     Wells' conduct under color of state law, as more fully alleged above, whether performed in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission, constituted discriminatory, biased and unfair disruption of Plaintiffs' participation

in their business association with SSR and in the licensing process. Wells' conduct under color of state law, as more fully alleged above, whether performed in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission, violated and continues to violate Plaintiffs' constitutionally protected property rights as secured under the Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

128.    By manipulating and abusing her investigatory and adjudicatory power to interfere with Plaintiffs' and their partners' category 1 gaming application, Wells, whether acting in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission, has deprived and continues to deprive Plaintiffs of the enjoyment of their constitutionally protected property rights without due process of law.

129.    Wells, whether acting in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission, has intentionally and wrongfully singled out Plaintiffs for adverse treatment relating to their protectable and legitimate interests in the fair and impartial consideration of Plaintiffs' suitability to participate as a partner in the SSR application for a category 1 gaming license.

130.    Wells' adverse treatment of Plaintiffs was and is arbitrary and irrational, without authority under the law, and motivated by malicious and bad faith intent to block the fair and impartial consideration of SSR's application.

131.    Wells' intentional misconduct has violated and continues to violate Plaintiffs' procedural due process rights to an application process that is non-discriminatory, unbiased and fair.

132.    Wells' intentional misconduct has violated and continues to violate Plaintiffs' substantive due process right not to be deprived of the use of their property except by laws,

regulations or government actions that are rationally related to a legitimate governmental interest.

133.    Plaintiffs have suffered, and continue to suffer, injuries as a result of Wells' wrongful acts and omissions.

## COUNT III

### Violations of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution (Equal Protection) v. Defendant Crosby in His Official and Individual Capacities

134.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

135.    By virtue of, *inter alia*, Plaintiffs' compliance with the Gaming Act and the investment of tens of millions of dollars in the license application process,  Plaintiffs were possessed of a property right in their business association with SSR and to non-discriminatory, unbiased and fair consideration in that process.

136.    Crosby's conduct under color of state law, as more fully alleged above, constituted, and continues to constitute on a going-forward basis, discriminatory, biased and unfair disruption of Plaintiffs' business association with SSR and participation in the licensing process, thereby denying Plaintiffs equal protection of law.

137.    Crosby's conduct under color of state law, as more fully alleged above, violated, and continues to violate, Plaintiffs' constitutionally protected equal protection rights as secured under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

138.    Crosby's past and future disparate treatment of Plaintiffs, including his discriminatory, arbitrary and capricious handling of Plaintiffs' pursuit of a suitability determination, has denied, and continues to deny, Plaintiffs their right to equal protection of law.

139.     Crosby has intentionally and wrongfully singled out Plaintiffs for adverse treatment relating to their protectable and legitimate interests in the fair and impartial consideration of their suitability to participate as partners in the SSR application for a category 1 license.

140.     Crosby's adverse treatment of Plaintiffs was and is arbitrary and irrational, without authority under the law, and motivated by malicious and bad faith intent to block the fair and impartial consideration of SSR's application for a category 1 license.

141.     Crosby's actions and statements have violated, and continue to violate, Plaintiffs' right to equal protection of the laws as guaranteed under the United States Constitution.

142.     Plaintiffs have suffered and continue to suffer economic and reputational injuries as a result of Crosby's wrongful acts and omissions for which Crosby is liable under the provisions of 42 U.S.C. § 1983.

## COUNT IV

**Violations of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution (Equal Protection) v. Defendant Wells in Her Official and Individual Capacities**

143.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

144.     By virtue of, *inter alia*, Plaintiffs' compliance with the Gaming Act and the investment of tens of millions of dollars in the license application process,  Plaintiffs were possessed of a property right in their business association with SSR and to non-discriminatory, unbiased and fair consideration in that process.

145.     Wells' conduct under color of state law, as more fully alleged above, whether performed in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the

Commission, constituted, and continues to constitute on a going-forward basis, discriminatory, biased and unfair disruption of Plaintiffs' business association with SSR and participation in the licensing process, thereby denying Plaintiffs equal protection of law.

146. Wells' conduct under color of state law, as more fully alleged above, whether performed in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission, violated, and continues to violate, Plaintiffs' constitutionally protected equal protection rights as secured under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

147. Wells' past and future disparate treatment of Plaintiffs, including her discriminatory, arbitrary and capricious handling of Plaintiffs' pursuit of a suitability determination, whether done in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission, has denied, and continues to deny, Plaintiffs their right to equal protection of law.

148. Wells, whether acting in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission, has intentionally and wrongfully singled out Plaintiffs for adverse treatment relating to their protectable and legitimate interests in the fair and impartial consideration of their suitability to participate as partners in the SSR application for a category 1 license.

149. Wells' adverse treatment of Plaintiffs was and is arbitrary and irrational, without authority under the law, and motivated by malicious and bad faith intent to block the fair and impartial consideration of SSR's application for a category 1 license.

150. Wells' actions and statements have violated, and continue to violate, Plaintiffs' right to equal protection of the laws as guaranteed under the United States Constitution.

151.    Plaintiffs have suffered and continue to suffer economic and reputational injuries as a result of Wells' wrongful acts and omissions.

## COUNT V

### Declaratory Relief v. Defendant Crosby in His Official Capacity

152.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

153.    Actual controversies exist between Plaintiffs and Crosby with respect to whether Crosby's conduct as more fully alleged above violated, and continues to violate, Plaintiffs' due process and equal protection rights and constitutes an unlawful taking, all causing Plaintiffs economic and reputational injury. Because the Bureau is expressly authorized to "provide pertinent information regarding applicants or licensees from or to law enforcement entities or gaming authorities and other domestic, federal or foreign jurisdictions, including the Federal Bureau of Investigation, and may transmit such information to each other electronically," M.G.L. c. 32K, § 6(e), the violation of Plaintiffs' rights continues because the Plaintiffs' Suitability Report remains a part of the public record and subject to distribution to other regulatory bodies and law enforcement agencies.

154.    Such controversies are ripe for determination, and should be determined as soon as feasible.

155.    These controversies have caused, and threaten to continue to cause, damage to Plaintiffs.

156.    Plaintiffs have not made a prior application for the relief sought herein to this Court or any other court.

157.    In support of the injunctive relief requested hereafter, Plaintiffs request entry of declaratory judgments that:

      a.    the suitability process as to Plaintiffs was constitutionally flawed; and

      b.    the Plaintiffs' Suitability Report issued as to Plaintiffs and Caesars is a nullity, entitled to no force or effect.

## COUNT VI

### Declaratory Relief v. Defendant Wells in Her Official Capacity

158.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

159.    Actual controversies exist between Plaintiffs and Wells with respect to whether Wells' conduct as more fully alleged above, whether performed in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission, violated, and continues to violate, Plaintiffs' due process and equal protection rights and constitutes an unlawful taking, all causing Plaintiffs economic and reputational injury.  Because the Bureau is expressly authorized to "provide pertinent information regarding applicants or licensees from or to law enforcement entities or gaming authorities and other domestic, federal or foreign jurisdictions, including the Federal Bureau of Investigation, and may transmit such information to each other electronically,"  M.G.L. c. 32K, § 6(e), the violation of Plaintiffs' rights continues because the Bureau's report remains a part of the public record and subject to distribution to other regulatory bodies and law enforcement agencies.

160.    Such controversies are ripe for determination, and should be determined as soon as feasible.

161.    These controversies have caused, and threaten to continue to cause, damage to Plaintiffs.

162.    Plaintiffs have not made a prior application for the relief sought herein to this Court or any other court.

163.    In support of the injunctive relief requested hereafter, Plaintiffs request entry of declaratory judgments that:

    a.  the suitability process as to Plaintiffs was constitutionally flawed; and

    b.  the Plaintiffs' Suitability Report issued as to Plaintiffs and Caesars is a nullity, entitled to no force or effect.

## COUNT VII

### Injunctive Relief Pursuant to 28 U.S.C. §§ 1651 and 1983 v. Defendant Crosby in His Official Capacity

164.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

165.    Plaintiffs have been, and continue to be, irreparably injured as a result of the deprivation of their constitutional rights by Crosby.

166.    As Plaintiffs do not have an adequate or complete remedy at law to redress the violations of their constitutional rights as outlined above, this suit for injunctive and supporting declaratory judgment is their only means of securing complete and adequate relief.

167.    By his actions, Crosby has caused the issuance of, and has not withdrawn, a report which wrongfully states that Plaintiffs did not meet their burden of proving suitability to participate in a category 1 license application, when in fact such report was not a product of any failure on Plaintiffs' part but rather was the result of an unfair, discriminatory and biased process.

168.    No other remedy would offer Plaintiffs complete protection from the continuation of Crosby's unlawful and unconstitutional acts, policies and practices.

169.    Considering the balance of hardships between Plaintiffs and Crosby, the requested remedy in equity is warranted, and the public interest would be served by the requested injunction.

170.    For these reasons, Plaintiffs request a permanent injunction:

    a.  prohibiting Crosby from relying upon, providing to others (including other gaming commissions and their investigative arms), or disseminating the constitutionally flawed Plaintiffs' Suitability Report; and

    b.  ordering the withdrawal and permanent sealing of the Plaintiffs' Suitability Report.

## COUNT VIII

### Injunctive Relief Pursuant to 28 U.S.C. §§ 1651 and 1983 v. Defendant Wells in Her Official Capacity

171.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

172.    Plaintiffs have been, and continue to be, irreparably injured as a result of the deprivation of their constitutional rights by Wells, whether acting in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission.

173.    As Plaintiffs do not have an adequate or complete remedy at law to redress the violations of their constitutional rights as outlined above, this suit for injunctive and supporting declaratory judgment is their only means of securing complete and adequate relief.

174.     By her actions, whether in concert with Crosby and/or others, or unilaterally as asserted by Crosby and the Commission, Wells has caused the issuance of, and has not withdrawn, a report which wrongfully states that Plaintiffs did not meet their burden of proving suitability to participate in a category 1 license application, when in fact such report was not a product of any failure on Plaintiffs' part but rather was the result of an unfair, discriminatory and biased process.

175.     No other remedy would offer Plaintiffs complete protection from the continuation of Wells' unlawful and unconstitutional acts, policies and practices.

176.     Considering the balance of hardships between Plaintiffs and Wells, the requested remedy in equity is warranted, and the public interest would be served by the requested injunction.

177.     For these reasons, Plaintiffs request a permanent injunction

a. prohibiting Wells from relying upon, providing to others (including other gaming commissions and their investigative arms), or disseminating the constitutionally flawed Plaintiffs' Suitability Report; and

b. ordering the withdrawal and permanent sealing of the Plaintiffs' Suitability Report.

## COUNT IX

**Tortious Interference With Advantageous Relations v. Defendant Crosby in His Individual Capacity**

178.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

179.     Plaintiffs had an advantageous business relationship with their partners in SSR, which, without regard to whether a license was ultimately obtained by the partnership, would

have permitted Plaintiffs to participate fully in the application process, without injury to their reputations in the gaming community, in Massachusetts and worldwide.

180.    Crosby, acting outside the scope of his official employment, knew about and intentionally interfered with Plaintiffs' advantageous relationship with SSR, leading to Plaintiffs' withdrawal from the relationship.

181.    Crosby's interference was accomplished using improper means.

182.    Crosby's interference was inspired by improper motives.

183.    Plaintiffs have suffered, and continue to suffer, economic and reputational injuries as a result of Crosby's conduct.

184.    Plaintiffs were harmed, and continue to suffer harm, as a result of Crosby's actions.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Enter judgment on each and every Count of the Third Amended Complaint in Plaintiffs' favor and award them such damages against Defendant Crosby in his personal capacity as may be proven at trial;

2.    Enter a declaratory judgment in aid of the prospective injunctive relief sought in prayer 3 determining the rights of the parties and declaring that (a) the suitability process as to Plaintiffs was constitutionally flawed, and (b) the Plaintiffs' Suitability Report is therefore a nullity, entitled to no force or effect;

3.    Enter a permanent injunction (a) prohibiting Crosby and Wells, directly or through others, from relying upon, providing to others (including other gaming commissions and their investigative arms), and disseminating the constitutionally

flawed Plaintiffs' Suitability Report; and (b) ordering the withdrawal and permanent sealing of the Bureau's unconstitutionally flawed Plaintiffs' Suitability Report,

4. Order Defendants, or either of them, to pay Plaintiffs' reasonable costs and attorneys' fees; and

5. Grant Plaintiffs such other, further and different relief as may be just and appropriate.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES AND CLAIMS SO TRIABLE.

Respectfully submitted,

Dated: August 2, 2014

CAESARS MASSACHUSETTS
MANAGEMENT COMPANY, LLC,
CAESARS MASSACHUSETTS
DEVELOPMENT COMPANY, LLC,
CAESARS MASSACHUSETTS
INVESTMENT COMPANY, LLC, and
CAESARS ENTERTAINMENT
CORPORATION

By their attorneys,

/s/ Joan A. Lukey
Joan A. Lukey (BBO # 307340)
Christopher Thomas Brown (BBO # 667558)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Tel: (617) 951-7000
Joan.Lukey@ropesgray.com
Thomas.Brown@ropesgray.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 2, 2014.

/s/ Eugene L. Morgulis
Eugene L. Morgulis

# Exhibit 1



Timothy R. Donovan
Executive Vice-President, General Counsel and
Chief Regulatory & Compliance Officer
Phone: (702) 407-6393
Email: tdonovan@caesars.com

May 12, 2014

**BY FIRST CLASS MAIL AND E-MAILS**

Catherine Blue
General Counsel
Massachusetts Gaming Commission
84 State Street, 10th Floor
Boston, MA 02109

Re:    Recusal of Chairman Crosby from Commission Deliberations

Dear Ms. Blue:

I write regarding the decision by Commission Chairman Stephen P. Crosby to recuse himself from all further deliberations related to the Region A licensing process, as announced on May 8, 2014.

Chairman Crosby's belated recusal is a troubling confirmation of the bias that has infected the Region A suitability process from the start, and to which Caesars Entertainment Corporation and its affiliates (collectively, "Caesars") have fallen victim. More particularly, the acknowledgement of bias inherent in Chairman Crosby's recusal highlights the ongoing harm that Caesars suffers through the Commission's continuing dissemination of the Suitability Report prepared under Chairman Crosby's direction, and

Caesars' entitlement to the relief sought in the pending Federal lawsuit against Chairman Crosby.

In light of Chairman Crosby's belated decision to recuse himself from future involvement in the licensing process, the Commission cannot in good faith deny the harm that Caesars has suffered and continues to suffer as a result of the Commission continuing to disseminate the Suitability Report, which was the product of a biased investigational process and denial of Caesar's right to challenge those findings, all while Chairman Crosby remained actively involved. We therefore call upon the Commission to take the following steps immediately to mitigate the ongoing harm to Caesars:

(1)     Expressly acknowledge that the process leading to the Suitability Report was constitutionally flawed;

(2)     Expressly acknowledge that the Suitability Report is a nullity, of no force or effect, and no longer part of the Commission's official records;

(3)     Remove the Suitability Report from the Commission's website permanently and otherwise refrain from further dissemination of the Suitability Report;

(4)     Stamp as "VOID" any copies of the Suitability Report within the Commission's possession, custody, or control; and append to each copy a statement that the Suitability Report has been withdrawn as a result of the constitutionally flawed process by which it was prepared;

(5)     Respond to any request for information about Caesars by reporting that Caesars withdrew from the Region A application process because of the constitutionally flawed process for preparing and reviewing the Suitability Report; and that, as a result, no report is available;

(6)     Send  letters, with copies to Caesar, to all persons and entities to whom the Commission has previously provided a copy of the Suitability Report, informing such person or entity that the Suitability Report is null and void and has been withdrawn because it was the product of a constitutionally flawed process; and

(7)     Acknowledge and confirm that the Suitability Report will not be considered as part of any future consideration of Caesars in this or any other licensing process before the Commission.

In consideration of the foregoing, Caesars confirms that it will not claim damages of any kind against the Commission relating to the license application process as that process has been conducted through the date of the Commission's written acceptance of the above terms.

Your prompt response is appreciated.

Very truly yours,

Timothy R. Donovan
Executive Vice President, General Counsel
& Chief Regulatory and Compliance Officer

cc: Scott Wiegand, Esq.
    Joan A. Lukey, Esq.